No. **13-2364**

*(Docket Number in District Court:  1:09-cv-01714-DAB)*

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

BELMONT HOLDINGS CORP., NORBERT G. KAESS and MARIA FARRUGGIO, on Behalf of Themselves and All Others Similarly Situated, and named plaintiffs EDWARD P. ZEMPRELLI and PLUMBERS' UNION LOCAL NO. 12 PENSION FUND, on Behalf of Themselves and All Others Similarly Situated,
*Plaintiffs-Appellants*,

[Caption continued on following page.]

Appeal from the United States District Court
for the Southern District of New York

PLAINTIFFS-APPELLANTS' OPENING BRIEF AND SPECIAL APPENDIX

ROBBINS GELLER RUDMAN
  & DOWD LLP
ANDREW J. BROWN
STEVEN F. HUBACHEK
ERIC I. NIEHAUS
LUCAS F. OLTS
CHRISTOPHER D. STEWART
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058

LAW OFFICES BERNARD M.
  GROSS, P.C.
DEBORAH R. GROSS
Wanamaker Bldg., Suite 450
100 Penn Square East
Philadelphia, PA  19107
Telephone:  215/561-3600

Counsel for Plaintiffs-Appellants

899330_1

SHIRLEY BACHRACH, GEORGE GERSON, Individually and on Behalf of All Others Similarly Situated, and RIDGE OAK MANAGEMENT, INC, on Behalf of Itself and All Others Similarly Situated,

*Plaintiffs*,

vs.

DEUTSCHE BANK AG, DEUTSCHE BANK CAPITAL FUNDING TRUST VIII, DEUTSCHE BANK CAPITAL FUNDING LLC VIII, DEUTSCHE BANK CAPITAL FUNDING TRUST X, DEUTSCHE BANK CAPITAL FUNDING LLC X, JOSEF ACKERMANN, ANTHONY DI IORIO, BANZIGER HUGO, TESSEN VON HEYDEBRECK, HERMANN-JOSEF LAMBERTI, MARTIN EDELMANN, PETE STURZINGER, DETLEF BINDERT, JONATHAN BLAKE, MARCO ZIMMERMANN, UBS SECURITIES LLC, CITIGROUP GLOBAL MARKETS, INC., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, WACHOVIA CAPITAL MARKETS, LLC, MORGAN STANLEY & CO. INCORPORATED, DEUTSCHE BANK SECURITIES INC., BANC OF AMERICA SECURITIES LLC, DEUTSCHE BANK CONTINGENT CAPTIAL TRUST III, DEUTSCHE BANK CONTINGENT CAPTIAL TRUST V, DEUTSCHE BANK CONTINGENT CAPTIAL TRUST LLC V, DEUTSCHE BANK CAPITAL FUNDING TRUST IX, DEUTSCHE BANKD CAPITAL FUNDING LLC IX, RAINER RAULEDER, DEUTSCHE BANK CONTINGENT CAPITAL TRUST III, DEUTSCHE BANK CONTINGENT CAPITAL LLC III, KPMG DEUTSCHE TREUHAND-GESELLSCHAFT, KPMG INTERNATIONAL, DEUTSCHE BANK CONTINGENT CAPITAL TRUST II, DEUTSCHE BANK CONTINGENT CAPITAL LLC II,

*Defendants-Appellees*.

*Belmont Holdings Corp., et al. v. Deutsche Bank AG, et al.*
Second Circuit No. 13-2364

## CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellant Belmont Holdings Corp., is owned by the Perelman Education Foundation and the Judaica Foundation.  No publicly traded corporation holds 10% or more of its stock.

Plumbers' Union Local No. 12 Pension Fund does not issue stock, and is not a subsidiary of or otherwise controlled by a parent corporation.

- i -

# TABLE OF CONTENTS

**Page**

I.     JURISDICTION ..........................................................................................1

II.    ISSUES PRESENTED ...............................................................................3

III.   STATEMENT OF THE CASE ...................................................................4

    A.   Statement of Facts ...........................................................................4

        1.   Introduction and Nature of the Case ....................................4

        2.   DB's Mortgage-Related Assets .............................................8

        3.   DB Offered Its Preferred Shares in an Economic Environment in Which the Values of Mortgage-Related Securities Were Falling Dramatically .......................................10

        4.   The 2007 Offerings ..............................................................12

        5.   The February 2008 Offering ................................................14

        6.   The May 2008 Offering .......................................................15

        7.   DB's Toxic Assets Produced Catastrophic Losses ...............15

        8.   The Proposed Third Amended Complaint ...........................16

    B.   Course of Proceedings ...................................................................22

    C.   Relevant Orders .............................................................................24

        1.   Introduction ..........................................................................24

        2.   Denial of the Motion to Dismiss the CAC ...........................24

        3.   Defendants' Motion for Reconsideration .............................27

        4.   Plaintiffs' Motion for Reconsideration .................................28

**Page**

IV.    SUMMARY OF ARGUMENT ................................................29

V.    ARGUMENT ...............................................................................33

    A.    The Offering Materials Failed to Disclose DB's €20 Billion Exposure to Highly Risky Subprime/Nonprime Assets .....................33

        1.    Standard of Review and Introduction .......................................33

        2.    Item 503 Required Disclosure of DB's €20 Billion Exposure to Highly Risky Subprime/Nonprime Assets ..........35

        3.    Both GAAP and IFRS Rules Required Disclosure of DB's €20 Billion Exposure to Highly Risky Subprime/Nonprime Assets ........................................42

        4.    *Fait* Does Not Apply to Plaintiffs' Claims that DB's VaR Assurances Were Misleading ....................................49

    B.    *Barclays* Demonstrates that the District Court's Futility Analysis Was Erroneous and that Plaintiffs Should Have Been Permitted to Amend their Complaint to Comply With the District Court's Analysis of *Fait* .........................................51

        1.    Standard of Review .................................................51

        2.    *Barclays* Rejected the District Court's Futility Analysis .........52

        3.    The TCAC Adequately Pleaded Valuation Claims .................55

        4.    The Item 503 and Item 303 Claims .........................................60

        5.    The GAAP/IFRS Disclosure Claims .......................................64

        6.    The VaR Claim .......................................................65

VI.    CONCLUSION..............................................................66

899330_1

# TABLE OF AUTHORITIES

**Page**

## CASES

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)......................................................................................35

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..............................................................................35, 48

*Citiline Holdings, Inc. v. iStar Fin., Inc.*,
   701 F. Supp. 2d 506 (S.D.N.Y. 2010) ......................................................40

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
   399 F.3d 651 (6th Cir. 2005) ..............................................................48, 65

*City of Roseville Emps. Ret. Sys. v. EnergySolutions, Inc.*,
   814 F. Supp. 2d 395 (S.D.N.Y. 2011) ......................................................36

*Dluhos v. Floating & Abandoned Vessel*,
   162 F.3d 63 (2d Cir. 1998) ........................................................................54

*Elkind v. Liggett & Myers, Inc.*,
   635 F.2d 156 (2d Cir. 1980) ......................................................................54

*Ernst & Ernst v. Hochfelder*,
   425 U.S. 185 (1976)..............................................................................34, 54

*Fait v. Regions Fin. Corp.*,
   655 F.3d 105 (2d Cir. 2011) ...............................................................*passim*

*Foman v. Davis*,
   371 U.S. 178 (1962)..............................................................32, 53, 55, 62

*Freidus v. Barclays Bank PLC*,
   734 F.3d 132 (2d Cir. 2013) ...............................................................*passim*

*Ganino v. Citizens Utils. Co.*,
   228 F.3d 154 (2d Cir. 2000) ......................................................................43

899330_1

**Page**

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983)..................................................................................34, 35

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*,
    No. 11 Civ. 4209 (KBF), 2013 U.S. Dist. LEXIS 43774
    (S.D.N.Y. Mar. 27, 2013) .......................................................59, 60, 63

*In re Ambac Fin. Grp.*,
    693 F. Supp. 2d 241 (S.D.N.Y. 2010) ...............................................44

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410, 1421 (3d Cir. 1997) ...................................................44

*In re Citigroup Bond Litig.*,
    723 F. Supp. 2d 568 (S.D.N.Y. 2010) ...........................................43, 45, 46, 48

*In re Citigroup Inc. Sec. Litig.*,
    753 F. Supp. 2d 206 (S.D.N.Y. 2010) ........................................39, 46

*In re Fuwei Films Sec. Litig.*,
    634 F. Supp. 2d 419, 443 (S.D.N.Y. 2009) .......................................38

*In re IBM Corporate Sec. Litig.*,
    163 F.3d 102 (2d Cir. 1998) ...............................................................51

*In re Lehman Bros. Mortgage-Backed Sec. Litig.*,
    650 F.3d 167 (2d Cir. 2011) ........................................34, 47, 50, 58

*In re Lehman Bros. Sec. & ERISA Litig.*,
    799 F. Supp. 2d 258 (S.D.N.Y. 2011) ........................................*passim*

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010) ...............................................................34

*In re WorldCom, Inc. Sec. Litig.*,
    346 F. Supp. 2d 628 (S.D.N.Y. 2004) ................................................36

**Page**

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011),
    *cert. denied*, __ U.S.__, 132 S. Ct. 242 (2011)............................................*passim*

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
    681 F.3d 114 (2d Cir. 2012) .........................................................52, 62

*Press v. Quick & Reilly, Inc.*,
    218 F.3d 121 (2d Cir. 2000) ...............................................................53

*Ronzani v. Sanofi S.A.*,
    899 F.2d 195 (2d Cir. 1990) ...............................................................55

*SEC v. Caserta*,
    75 F. Supp. 2d 79 (E.D.N.Y. 1999) ....................................................43

*Seow Lin v. Interactive Brokers Grp., Inc.*,
    574 F. Supp. 2d 408 (S.D.N.Y. 2008) ...........................................35, 36

*Silverstrand Invs. v. AMAG Pharms., Inc.*,
    707 F.3d 95 (1st Cir. 2013),
    *cert. denied*, __ U.S. __, 2013 U.S. LEXIS 6984 (2013) ...........................*passim*

*United States v. Ebbers*,
    458 F.3d 110 (2d Cir. 2006) ...............................................................43

*Volvo N. Am. Corp. v. Men's Int'l Professional Tennis Council*,
    857 F.2d 55 (2d Cir. 1988) .................................................................55

*Williams v. Citigroup Inc.*,
    659 F.3d 208 (2d Cir. 2011) .........................................................53, 55

Page

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §77a ............................................................................................ 1
    §77k .................................................................................... *passim*
    §77*l*(a)(2) ......................................................................... *passim*
    §77*o* ..................................................................................... *passim*
    §77v ............................................................................................ 1
    §78j(b) ...................................................................................... 51
    §78*o* ....................................................................................... 55

28 U.S.C.
    §1291 ......................................................................................... 2
    §1331 ......................................................................................... 1

Securities Act
    §§11, 12(a)(2), and 15, ................................................... *passim*
    §22(a), ....................................................................................... 1

Federal Rules of Civil Procedure
    Rule 8(a)(2) ............................................................................. 35
    Rule 12(b)(6) ........................................................................... 33
    Rule 15(a) ................................................................................ 54
    Rule 59(e) ........................................................................ *passim*
    Rule 60(b) ................................................................... 2, 24, 29
    Rule 60(c)(1) ............................................................................. 2

Federal Rule of Appellate Procedure
    Rule 4(a)(4)(A) ......................................................................... 2

17 C.F.R.
    §210.4-01(a)(1) ...................................................................... 43
    §210.10-01 .............................................................................. 43
    §229.303 .................................................................................... 4
    §229.303(a)(3)(ii) .................................................................... 62
    §229.503 .................................................................................. 61
    §229.503(c) ............................................................ 3, 36, 41, 42

899330_1

## I.    JURISDICTION

This case arises under the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §77a *et seq.*, asserting claims under Securities Act §§11, 12(a)(2), and 15, 15 U.S.C. §§77k, 77*l*(a)(2), 77*o*.  The district court had jurisdiction under Securities Act §22(a), 15 U.S.C. §77v, and 28 U.S.C. §1331.

The Consolidated Amended Complaint ("CAC") alleges six sets of claims arising from six registered securities offerings.  Five of those offerings are at issue here, three from 2007 and two from 2008.  Joint Appendix ("JA") 26-JA99.[1]  The district court initially denied, in pertinent part, defendants' motions to dismiss those claims on August 19, 2011.  Special Appendix ("SPA") 1-SPA30 (Civil Docket ("CD") 59).  The district court granted defendants' motion for reconsideration of the August 2011 order on August 10, 2012, and reversed its prior rulings, dismissing the CAC with prejudice and concluding that any amendment would be futile.  SPA31-SPA36(CD70).  On August 17, 2012, the district court entered judgment dismissing plaintiffs' claims.  SPA37-SPA42(CD71).

On September 13, 2012, plaintiffs moved for reconsideration.   JA416-JA446(CD72-73).  Plaintiffs' Notice of Motion cited Local Rule 6.3, and the district court's August 10, 2012 order dismissing the CAC, and also stated that the motion

---

[1]     ***Bold*** emphasis is added, and internal citations omitted, unless otherwise noted.

was made "upon the accompanying Memorandum of Law in Support of Plaintiffs' Motion for Reconsideration." JA416-JA421(CD72). The memorandum of law stated that plaintiffs' motion for reconsideration was brought "[p]ursuant to Fed. R. Civ. P. 59(e) and 60(b)." JA427(CD73:1). Plaintiffs' motion was timely filed within 28 days of the entry of judgment. *See* Fed. R. Civ. P. 59(e); *see also* Fed. R. Civ. P. 60(c)(1).

On May 15, 2013, the district court found that plaintiffs' motion was timely made under Rule 59(e), and denied it on the merits. SPA43-SPA49(CD78:1-2 & n.1, 4).

Plaintiffs timely filed their notice of appeal on June 13, 2013, within 30 days of the May 15, 2013 order. JA753-JA758(CD80).

On June 21, 2013, Defendants-Appellees moved this Court to dismiss this appeal, claiming that plaintiffs' reconsideration motion was not made under Rule 59(e). On July 23, 2013, after full briefing, this Court denied the motion, holding that "Appellants' notice of appeal from the final judgment was timely filed, as their motion for reconsideration was a post-judgment motion that properly tolled the time for filing under Federal Rule of Appellate Procedure 4(a)(4)(A)." Case No. 13-2364(Document 57).

This Court has jurisdiction under 28 U.S.C. §1291.

899330_1

## II.    ISSUES PRESENTED

1.    Whether the district court erred in holding that Item 503 of Regulation S-K, 17 C.F.R. §229.503(c), and various accounting principles did not require Deutsche Bank ("DB" or the "Company") to disclose its €20 billion exposure to risky subprime/nonprime mortgage-related assets, even though the financial crisis that threatened their value manifested itself long before the first offering and intensified throughout 2007 and into 2008?

2.    The district court initially ruled that DB's representations regarding its Value-at-Risk ("VaR") metric, a statistical measure of market risk, stated a claim because DB's actual losses were almost 700% above the stated VaR range and DB stated that risk outside that range was immaterial.  The district court reversed itself, finding DB's statements were opinions.  The issue is whether DB's trading losses and its unconditional materiality statement were opinions?

3.    The district court dismissed the CAC because it held that the challenged asset valuations constituted DB's opinions and plaintiffs had not alleged that those opinions were not honestly held.  It further concluded that amendment was futile because plaintiffs disavowed knowing misconduct.    Plaintiffs moved for reconsideration, proposing to file a Third Amended Complaint ("TCAC") alleging facts demonstrating that DB knew that its assets had lost value before the first offering

- 3 -

and its valuations were therefore inaccurate, it violated disclosure duties under Item 503, Item 303 of Regulation S-K, 17 C.F.R. §229.303, and various accounting principles, and its VaR metrics were knowingly inaccurate. The district court denied the motion. The issue is whether, in light of the holding in *Freidus v. Barclays Bank PLC*, 734 F.3d 132, 141 (2d Cir. 2013), that alleging an opinion was not honestly held does not require scienter, the district court erred in concluding amendment would be futile because the CAC disavowed knowing misconduct?

## III.  STATEMENT OF THE CASE

### A.  Statement of Facts

#### 1.  Introduction and Nature of the Case

This is a putative class action on behalf of all persons who acquired or purchased preferred securities pursuant to DB's 2006 Shelf Registration Statement and Prospectus, as well as the Supplemental Prospectuses (together, the "Offering Materials"), all of which were materially false and misleading because all but the May 2008 offering failed to disclose DB's €20 billion exposure, in the midst of the financial crisis, to highly risky subprime/nonprime mortgage-backed assets, all of the offerings failed accurately to value those toxic assets, and DB's statements regarding

- 4 -

VaR were misleading.[2]  Over the course of five public offerings held from May 2007 to June 2007 (the "Offering Period"), plaintiffs Belmont Holdings Corp., Norbert G. Kaess, Maria G. Farrugio, Edward P. Zemprelli, Plumbers' Union Local No. 12 Pension Fund, and other investors purchased nearly $5.5 billion worth of DB's Securities, all at $25 per share.  JA27-JA28, JA32-JA33(CAC¶¶2, 16-19).  In the May 2007 offering, defendants offered for sale 32,000,000 6.55% preferred securities. JA27-JA28, JA47(CAC¶¶2, 77).  In the July 2007 offering, defendants offered for sale 40,000,000 6.625% preferred securities.  JA27-JA28, JA47(CAC¶¶2, 80).  In the November 2007 offering, defendants offered for sale 32,200,000 7.35% preferred securities.    JA27-JA28,  JA48(CAC¶¶2,  83).    In  the  February  2008  offering, defendants  offered  for  sale  70,000,000  7.6%  preferred  securities.    JA27-JA28, JA62(CAC¶¶2,  122).    In  the  May  2008  offering,  defendants  offered  for  sale 44,000,000 8.05% preferred securities.  JA27-JA28, JA73(CAC¶¶2, 154).

---

[2]      JA27-JA31(CAC¶¶2-10).  The 2006 Shelf Registration Statement was filed on October 10, 2006.  JA27-JA28(CAC¶2).  It was amended in July 2007 to add two registrants (DB Capital Funding LLC IX and DB Capital Funding Trust IX). JA36(CAC¶34 n.2).  The five prospectus supplements were filed on May 16, 2007 (6.55% Noncumulative Trust Preferred Securities of Deutsche Bank Capital Funding Trust VIII), July 16, 2007 (6.625% Trust Preferred Securities of Deutsche Bank Contingent Capital Trust II), November 6, 2007 (7.35% Noncumulative Trust Preferred Securities of Deutsche Bank Capital Funding Trust IX), February 14, 2008 (7.60% Trust Preferred Securities of Deutsche Bank Capital Funding Trust X), and May 5, 2008 (8.05% Trust Preferred Securities of Deutsche Bank Capital Funding Trust V).  JA27-JA28(CAC¶2).

899330_1

The action alleges strict liability and negligence-based claims under §§11, 12(a)(2), and 15 of the Securities Act against various defendants responsible for the Offering Materials' false and misleading contents, including DB, the Registrant, and its various related entities, current or former DB directors and executives, and the investment banks that underwrote the offerings.[3]  Plaintiffs allege that the Offering Materials contained materially false and misleading statements and omissions concerning: DB's €20 billion exposure to high-risk subprime and nonprime residential mortgage markets through residential mortgage-backed securities ("RMBS") and collateralized debt obligations ("CDO"), as well as other mortgage-related assets, all in violation of Generally Accepted Accounting Principles ("GAAP"), Securities and Exchange Commission ("SEC") regulations and later International Financial Reporting Standards ("IFRS").   For example, despite the dramatic collapse of the U.S. housing and mortgage markets, defendants failed to disclose in the first four offerings (May 2007, July 2007, November 2007 and February 2008) material information about DB's massive position in these high-risk securities, including the nature and extent of DB's investment in those securities, that DB's position included RMBS and

---

[3]    JA33-JA39(CAC¶¶20-52).   The "DB Defendants" are listed at JA33-JA38(CAC¶¶20-44).    The "Underwriter Defendants" are listed at JA38-JA39(CAC¶¶46-52).  Unless otherwise noted, the DB Defendants and the Underwriter Defendants will be referred to collectively as "defendants."

899330_1

CDOs backed by some of the very riskiest mortgages with the highest rates of default, and the financial and the liquidity risks those securities posed to the Company. Nor did DB adequately value those assets, and its statements regarding its VaR metric were misleading. JA44-JA47, JA51-JA54, JA63-JA65, JA75-JA76, JA78-JA80(CAC¶¶68-75, 90, 94-95, 124-129, 161-163, 170-171).

Within months of the last offering, DB announced, on January 14, 2009, that it anticipated a loss after taxes of €4.8 billion for the fiscal 2008 fourth quarter, driven by negative revenues of €4.8 billion in DB's sales and trading businesses: Credit Trading, Equity Derivatives and Equity Proprietary Trading. JA31(CAC¶10). On February 5, 2009, DB announced a net loss of €3.9 billion for the entire fiscal year 2008, and a pre-tax loss of €5.7 billion. *Id*. The deterioration of DB's mortgage-related assets also contributed to its historic 2008 losses. *Id*. For the full fiscal year, DB recorded €5.3 billion in write-downs on debt securities and other mortgage-related products, including leveraged loans and loan commitments, RMBS/CDOs, monoline insurers and commercial real estate. *Id*.

The disclosures of the true effects of DB's exposure to risky assets devastated the Securities' values. In all five offerings, the per-share offering price was $25. JA31(CAC¶11). On February 24, 2009, when the first complaint was filed in this action, the value of the 6.55% Securities closed at $8.00 per share, the value of the

- 7 -

6.625% Securities closed at $7.98 per share, the value of the 7.35% Securities closed at $8.35 per share, the 7.6% Securities closed at $8.99 and the 8.05% Securities closed at $11.20. *Id.* As a result of defendants' omissions and misstatements, the Securities' purchasers suffered significant damages. *Id.*

### 2. DB's Mortgage-Related Assets

Between May 16, 2007 and May 5, 2008, DB undertook five offerings of preferred securities, raising nearly $5.5 billion in Tier 1 capital. JA27-JA28(CAC¶2). Before those offerings, beginning in 2005, DB undertook a strategy of structuring, trading, and investing billions of dollars of highly risky RMBS and CDOs, backed by U.S. residential subprime and nonprime ("Alt-A") mortgages. JA29(CAC¶4). Subprime and Alt-A RMBS are securities backed by residential mortgages extended to borrowers who do not qualify for standard loans, and therefore are inherently more risky than RMBS backed by conforming loans. JA29(CAC¶5).

Throughout the Offering Period, DB's exposure to a collapsing U.S. real estate market exceeded €20 billion. JA54(CAC¶96). That exposure included €3.46 billion in CDOs, structured asset-backed securities whose value and payments are derived from a portfolio of fixed-income underlying assets, including subprime/nonprime mortgages. JA54(CAC¶97). Of this amount, 30% or €1.1 billion comprised "mezzanine" CDOs, which were particularly risky because they were backed by

- 8 -

nothing more than the lowest-rated and highest-risk tranches of residential mortgage-backed securities, groups of mortgages that were repackaged into securities. JA55(CAC¶98). DB also had €9.7 billion exposure directly through RMBS. JA56(CAC¶102). Of the subprime collateral, a large percentage was originated in 2006 and 2007, years for which mortgage default rates were more than double the loss rates of 2005 and earlier vintages. *Id.* Additionally, underlying a significant portion of DB's RMBS and CDOs were "option ARM" and negative-amortization loans, loans that were particularly susceptible to default. JA29(CAC¶5).

DB had an additional €9 billion of net counterparty exposures to monoline insurers, entities that offered insurance for debt payments in the event of an issuer's default. JA55(CAC¶99). While DB represented it utilized these monoline insurers as "hedges," they were ill-suited for that purpose because the extreme risk of the subprime/nonprime assets they insured led to financial failure of many monoline insurers faced with multiple claims arising from an increasing number of defaults. JA55(CAC¶99). DB's monoline insurers were thus themselves a source of risk. JA55-JA56(CAC¶100). By early 2007, it was clear that monoline insurers were grievously overextended, insuring hundreds of billions of dollars of failing subprime CDOs and other mortgage-related assets. JA56(CAC¶101).

- 9 -

### 3. DB Offered Its Preferred Shares in an Economic Environment in Which the Values of Mortgage-Related Securities Were Falling Dramatically

DB's subprime/nonprime exposure was significant because of the collapse of the U.S. real estate market that began before the five offerings and continued through the Offering Period. DB's subprime and Alt-A RMBS/CDO portfolio was directly tied to the strength of the U.S. housing market, but in early 2006 housing prices began to stall and interests rates to rise. JA29-JA30(CAC¶6). As a result, over-extended homeowners began to default on their loans in increasing rates, which accelerated in 2007. *Id.* That acceleration resulted in a cascading effect on the credit markets due to the correlation of the rising rate of default for subprime and Alt-A mortgages with the decline in value of the securities backed by these mortgages.[4]

The effects of the degradation of the subprime markets in 2006 and 2007 were widespread. By September 2006, the number of properties that had entered into foreclosure had increased 53% from a year earlier; by November 2006, subprime loans made in 2006 were "going bad" at a rate 50% higher than those originated in 2005; and by December 2006, subprime borrowers had a 12.5% delinquency rate for

---

[4] *Id.* DB also held, but did not disclose, a significant unknown amount of credit-default swaps, that allowed traders to bet on the credit-worthiness of individual companies, an investment resulting in almost $2 billion in losses by the end of 2008. JA57(CAC¶103).

the third quarter, the highest in over three years.  JA57-JA58(CAC¶105).  In February 2007, *The Wall Street Journal* reported that foreclosure rates on subprime mortgage loans in 2006 more than doubled from 2005.  *Id*.  In early 2007, subprime lenders experienced the effects of the looming crisis, as manifested by increasing loss provisions, bankruptcy filings, and delinquency rates.  *Id*.  In April 2007, Merrill Lynch cancelled planned CDO auctions due to the assets' extreme illiquidity.  *Id*.

Specialized indices tracking RMBS and estimating the value of CDOs and other subprime assets, the ABX and TABX indices, reflected the effects of the crisis.  JA58-JA60(CAC¶¶106-112).  DB relied upon the ABX index in assessing how subprime mortgage-related assets performed in the marketplace.  JA58(CAC¶106).  Indeed, defendants closely tracked both indices.  JA59(CAC¶108).  Both the ABX and TABX indices plummeted throughout 2007, JA59-JA60(CAC¶¶111-112), which "made it clear to defendants that the value of DB's subprime/nonprime-backed RMBS/CDOs and other subprime/nonprime-related assets had declined significantly prior to the May 2007 Offering."  JA60-JA61(CAC¶113); *accord* JA54(CAC¶95(c)).

In addition to the diminution in value of their assets revealed to them by the crash of the ABX/TABX indices, "defendants were aware of, or otherwise ignored" the facts that DB's €20 billion subprime/nonprime exposure was "highly susceptible to the adverse events occurring in the U.S. subprime real estate market,"

- 11 -

JA54(CAC¶¶95, 95(a)), and that "warning signs demonstrat[ed] the U.S. subprime crisis directly affected the collateral underlying DB's subprime-backed assets[.]" JA54(CAC¶95(b)). "DB's own trading experience revealed the increasing illiquidity of its CDOs and mortgage-backed assets." JA54(CAC¶95(d)). Despite DB's knowledge of the precarious state of its mortgage-related assets, it neither revealed its €20 billion exposure during any of the first four offerings at issue in this appeal, nor did it accurately value those assets. JA51-JA52, JA60-JA61, JA63-JA65(CAC¶¶90, 113-114, 124-129).

### 4.    The 2007 Offerings

On May 16 and July 16, 2007, DB issued offerings of preferred securities, raising $1.8 billion from investors. JA27-JA28(CAC¶2). The offerings incorporated the 2006 20-F, filed March 27, 2007, JA47(CAC¶78), which extolled DB's careful management of credit and market risks, JA48-JA49(CAC¶¶85-86), but neither disclosed that DB held more than €20 billion in mortgage-backed securities, nor properly valued those troubled assets by taking appropriate write-downs – despite DB's knowledge that the rapidly decaying market diminished the value of its assets. JA51-JA52, JA60-JA61(CAC¶¶90, 113).

After the July offering, the market worsened. By the end of September 2007, CDO values were less than 35% of par, and the ABX index was in freefall. JA59-

- 12 -

JA60(CAC¶¶111-112).   In October and November of 2007, DB's peer financial institutions revealed staggering losses.  In October 2007, Merrill Lynch wrote down its ABS CDOs by $12.4 billion, and UBS wrote down $4.4 billion in subprime-related RMBS and CDOs.   JA61(CAC¶115).   Morgan Stanley, Bank of America, and Citigroup all experienced financial setbacks in November 2007, and the Federal Reserve injected $41 billion into the money supply.  JA61(CAC¶116).

Even so, in November 2007, DB issued another $805 million in preferred securities.  JA27-JA28(CAC¶2).  It incorporated the misleading 2006 20-F and the November 1, 2007 6-K.  JA48, JA50-JA51(CAC¶¶85, 89).  The 6-K revealed a 52% drop in Corporate and Investment Bank revenues, a reduction occurring largely because charges of "€1.6 billion were taken on trading activities in relative value trading in both debt and equity, CDO correlation trading and residential mortgage-backed securities."  JA50-JA51(CAC¶89).  But that narrow partial disclosure did not reveal the scope of DB's actual exposure to toxic assets, nor did its write-down properly reflect the plummeting value of its assets.  JA51-JA52, JA61(CAC¶¶90, 114).  Rather, DB assured investors that "[t]he strained situation in financial markets has eased somewhat of late, and a slight market recovery is in sight." JA61(CAC¶114).

### 5.    The February 2008 Offering

In February 2008, DB issued another $1.75 billion in preferred shares, JA27-JA28(CAC¶2), incorporating the 2006 20-F, November 2007 6-K, and the February 7, 2008 6-K.  JA61, JA63-JA64(CAC¶¶114, 123, 125).  Although peer institutions continued to report dramatic losses from late 2007 into early 2008, JA61-JA62(CAC¶¶117-118), and market conditions caused the value of DB's subprime and nonprime RMBS/CDO portfolios to dive, JA62(CAC¶120), DB took no write-downs, and instead trumpeted the effectiveness of its risk management, claiming that "[f]ollowing our decision to proactively manage down troubled risk positions in the third quarter and ongoing active risk management, we took no further losses on our remaining CDO exposures in the current quarter after taking into account related gains on hedge positions."  JA64(CAC¶125(a)).  DB similarly asserted that, even though revenues from "residential mortgage-backed securities, were significantly lower," DB "had no net write-downs related to sub-prime, CDO or RMBS exposures" in the fourth quarter because of "the quality of our risk management."  JA63-JA64(CAC¶¶125(a)-(b)).  Again, DB failed to disclose its exposure to the subprime/nonprime market, and failed accurately to value its assets.  JA63-JA65(CAC¶¶124-129).

- 14 -

### 6.    The May 2008 Offering

On May 5, 2008, DB issued another $1.1 billion in preferred shares.  JA27-JA28(CAC¶2).  The Offering Materials incorporated the 2006 20-F, as well as the 2007 20-F filed March 26, 2008 and the April 29, 2008 6-K.  JA73, JA78-JA79(CAC¶¶155, 170).  Again emphasizing its risk-management policies, JA73-JA75(CAC¶¶157-159), DB acknowledged, in the 2007 20-F, that "[v]alue-at-risk [VaR] is the primary metric we use in the management of our trading market risks." JA75(CAC¶159).  VaR is a "key statistical measure of market risk based on estimated likelihood of losses."  JA75-JA76(CAC¶161).  The 2007 20-F stated that DB's equities trading VaR ranged between $43.5 million and $90.5 million during 2007, and that its "'trading market risk outside of these units is immaterial.'"  JA76(CAC¶162). Despite DB's assurances, the Company reported equities trading losses for 2008 were $630 million, nearly 700% above the high end of the VaR range.  *Id.*  The financial crisis notwithstanding, DB took only an "€885 million [write-down] on residential mortgage-backed securities and commercial real estate loans."  JA79(CAC¶170).

### 7.    DB's Toxic Assets Produced Catastrophic Losses

On January 14, 2009, DB announced an anticipated loss after taxes of €4.8 billion for the fiscal 2008 fourth quarter, driven by negative revenues of €4.8 billion in its sales and trading businesses: Credit Trading, Equity Derivatives and Equity

- 15 -

Proprietary Trading. JA31, JA73-JA74(CAC¶¶10, 157). On February 5, 2009, it announced its first annual net loss since World War II of €3.9 billion for the entire fiscal year 2008, and a pre-tax loss of €5.7 billion. JA31, JA74-JA75(CAC¶¶10, 158). DB's deteriorating mortgage-related assets substantially contributed to the extraordinary 2008 losses. JA31(CAC¶10). For the full fiscal year, the Company recorded €5.3 billion in write-downs on debt securities and other mortgage-related products, including leveraged loans and loan commitments, RMBS/CDOs, monoline insurers and commercial real estate. JA31, JA74-JA75(CAC¶¶10, 158).

### 8.   The Proposed Third Amended Complaint

The proposed TCAC, filed in connection with plaintiffs' Rule 59(e) motion, alleged essentially all of the facts from the CAC discussed in the preceding sections, and added facts leaving no doubt that DB knew of, but did not disclose, the loss in value of its subprime/nonprime mortgage-related assets. Indeed, DB knew that the value of its RMBS and CDO assets was collapsing and profited from it, as DB's Executive Committee approved a $5 billion "short" position against the mortgage-backed asset market. JA455-JA456, JA458-JA460(TCAC¶¶3, 10-15).

Plaintiffs alleged that "Defendants were aware that their representations in the Offering Materials regarding their valuation of DB's mortgage-backed assets . . . were subjectively false." JA458(TCAC¶10); *see also* JA455-JA456, JA458, JA476-JA480,

- 16 -

JA484-JA486, JA489-JA490, JA496-JA498, JA503-JA504, JA509, JA512(TCAC¶¶3, 11, 80, 87-88, 98, 119, 134-135, 152, 159). ***Before the first offering in May 2007***, defendants: (1) knew that the mortgage-backed securities market was in collapse and would continue to worsen; (2) resolved to build a massive hedge-position against the RMBS/CDO market; and (3) were seeking to rid themselves of their own "long" mortgage-backed security positions. JA458(TCAC¶11).

DB was a leader in creating CDOs and RMBS, but found in 2006 that a slowing market led it to retain an increasing amount of these products on its books. JA458-JA459(TCAC¶12). This was alarming as highly-placed DB executives knew that DB's mortgage-backed securities were dramatically losing value. JA459(TCAC¶13). As reported in the United States Senate Permanent Subcommittee on Investigations' report entitled, "*Wall Street and the Financial Crisis: Anatomy of a Financial Collapse*," issued April 13, 2011 ("Levin-Coburn Report"), "Gregg Lippmann, the global head of DB's CDO, asset backed securities ('ABS'), and ABS Correlation Trading Desks described the CDO business in 2006 as a 'Ponzi scheme,' and described RMBS as 'pigs,' 'horrible,' 'crap,' [and] 'crap we shorted,' and [asserted] that the securities 'blow.'" JA459(TCAC¶13).

At Lippman's urging, DB sought to lessen the threat posed by its toxic holdings by amassing an enormous short position against the mortgage-backed security market,

899330_1

a hedge that reached $5 billion by early 2007. JA459, JA485-JA486, JA513-JA514(TCAC¶¶14, 88, 162-164). Lippman proceeded incrementally: in November 2005 he received permission to undertake a $1 billion short position against mortgage-related securities, a position he increased to $2 billion in 2006. JA459, JA513-JA514(TCAC¶¶14, 163). As set out in the Levin-Coburn Report, Lippmann increased that position to a staggering $5 billion bet against the mortgage-backed security market which Lippmann was directed to maintain, after he made a presentation, by DB's Executive Committee in late February or early March 2007. JA460, JA514-JA515(TCAC¶¶15, 165-166). The Executive Committee also approved other aggressive hedging strategies employing U.S. Treasury bonds. JA460(TCAC¶15). DB acknowledged that despite its hedging efforts, DB lost about $4.5 billion on those mortgage-related holdings for 2007, a figure it concealed in its Offering Materials. JA460, JA514-JA515(TCAC¶¶15, 165-166).

In short, DB realized that its CDOs and RMBS had lost value and would continue to do so, but persisted in structuring mortgage-backed security deals as long as possible because it generated substantial fees from them, as both Lippman and the head of DB's CDO group, Michael Lamont, acknowledged. JA462, JA515(TCAC¶¶19-20, 166). Even so, the TCAC made clear that "defendants failed to disclose DB's true exposure to the mortgage-backed securities to investors, and

- 18 -

knowingly misrepresented the size of its losses and value of those securities." JA462(TCAC¶20).

The Financial Crisis Inquiry Commission ("FCIC") Report also demonstrated that DB knew the mortgage-backed securities it held were far less valuable than DB represented and that DB was also aware of the systematic abandonment of underwriting guidelines by loan originators, and even participated in the origination of defective loans. JA460-JA461(TCAC¶16). Because of these deficiencies, the underlying loans were far less valuable than their credit ratings suggested. JA459(TCAC¶13). For example, by 2007, DB was aware of the abandonment of underwriting standards because by 2006 it hired a due-diligence vendor, Clayton Holdings, Inc., that reviewed a sample of loans and reported that 35% of them were defective. JA461, JA517-JA518(TCAC¶¶17, 168-170). Yet DB placed half of those defective loans into RMBS, falsely informing investors that the loans complied with stated underwriting guidelines, JA461, JA517-JA518(TCAC¶¶17, 169), a practice supporting the Levin-Coburn Report's conclusion that "'Deutsche Bank underwrote securities using loans from subprime lenders known for issuing high risk, poor quality mortgages, and sold risky securities to investors across the United States and around the world.'" JA461-JA462(TCAC¶18).

- 19 -

DB's knowledge that originators were not complying with underwriting standards was confirmed by its July 2006 acquisition of MortgageIT, an originator that repeatedly failed to adhere to standards. JA519(TCAC¶¶172-174). DB knew of MortgageIT's practices: MortgageIT originated billions of dollars of mortgage loans that did not comply with stated lending practices, misrepresented the borrowers' ability to repay, and were likely to default. JA519(TCAC¶172). DB entered, in May 2012, a $202.3 million settlement with the U.S. Government arising from MortgageIT's lending and underwriting practices and disclosures, in which DB and some of its affiliates "admit, acknowledge, and accept responsibility for the fact" that after acquiring MortgageIT in 2006, DB and its management "were in a position to know that the operations of MortgageIT did not conform fully to all of HUD-FHA's regulations, policies, and handbooks." JA520(TCAC¶177).

Because of DB's nondisclosures, the TCAC alleged that the Offering Materials for all five of the offerings at issue here contained misleading valuations. JA476-JA480, JA496-JA498, JA504(TCAC¶¶80, 119, 135). The TCAC re-alleges all of the CAC's claims – including the valuation theories that were the basis for the district court's reconsideration of its initial denial of the motion to dismiss – and also alleges violations of Item 303. JA476-JA486, JA489-JA490, JA496-JA498, JA504, JA512(TCAC¶¶80-82, 87-88, 98, 119, 135, 159). As to the valuation issues, the fact

- 20 -

that DB, led by Lippmann and approved by its Executive Committee, took what became, prior to the first offering, a $5 billion position betting against the subprime/nonprime market, JA459-JA460, JA512-JA515(TCAC¶¶13-15, 159-166), demonstrated that "DB knew . . . that the *value* of these mortgage-backed securities was in the process of collapse" throughout the Offering Period.  JA459(TCAC¶13).  DB also knew, throughout the Offering Period, that the value of its subprime/nonprime assets was undercut because its loan originators disregarded underwriting standards, which rendered the securities' ratings unreliable, and resulted in a default risk that was far higher than disclosed.  JA460-JA461, JA477, JA496, JA504, JA517-JA520(TCAC¶¶16, 80(b), 119(b), 135(a), 168-177).  Thus, DB was subjectively aware of, and did not disclose, the diminution in value of its subprime/nonprime mortgage-based assets *as to all five offerings*.  JA476-JA480, JA496-JA498, JA504(TCAC¶¶80, 119, 135).

The €1.6 billion write-down reflected in the November 1, 2007 Form 6-K, and its assurances of improving markets were knowingly misleading for the same reasons *and* because of DB's knowledge that its 2007 losses were "about $4.5 billion." JA477-JA478, JA496-JA498, JA514-JA515(TCAC¶¶80(b)-(d), 119, 165-166).  The misleading November 6-K was incorporated into both the November 2007 and February 2008 offerings.  JA475(TCAC¶79).  DB incorporated no write-downs into

- 21 -

the February 2008 offering, JA495-JA496(TCAC¶117(b)), and its asset valuation was knowingly misleading for the same reasons as in the preceding offerings. JA496(TCAC¶119(b)).

The May 2008 offering incorporated the April 2008 6-K which reflected "net mark-downs of €885 million on residential mortgage-backed securities and commercial real estate loans." JA504(TCAC¶135(a)). DB knew the value of its mortgage-backed securities was overstated for all the same reasons set forth above, and therefore knew that its €885 million write-down did not adequately reflect the actual value of the securities as of the May 2008 offering. *Id*. Additionally, "Defendants were aware that their representations in the Offering Materials regarding their . . . VaR metrics were subjectively false." JA458(TCAC¶10); *accord* JA501, JA521(TCAC¶¶129, 179).

## B.    Course of Proceedings

Named plaintiff Edward Zemprelli, who had acquired securities in the November 2007 offering, filed the first complaint against defendants. CD1. Related actions followed. The district court, Honorable Deborah A. Batts, consolidated the several actions, appointed lead plaintiffs, and approved their choice of Lead Counsel. CD19, 27. On January 25, 2010, they filed the CAC, the operative pleading on

- 22 -

appeal. JA26-JA99. The CAC alleged claims arising from the five offerings at issue in this appeal, as well as a sixth offering in October 2006.

Defendants moved to dismiss the CAC on March 26, 2010. JA100-JA291, JA292-JA294. Plaintiffs opposed. CD50. The district court granted the motion in part on August 19, 2011, dismissing the claims arising from the October 2006 offering, but sustaining the three 2007 offerings and the two 2008 offerings.[5] The October 2006 claims are not renewed here.

Defendants moved for reconsideration of the August 19 order on August 31, 2011. JA335-JA336. Plaintiffs opposed. CD64. On August 10, 2012, the district court granted defendants' motion for reconsideration, dismissing all claims with prejudice and without leave to amend. SPA31-SPA36(CD70). The district court entered judgment on August 17, 2012. SPA37-SPA42(CD71).

On September 13, 2012, plaintiffs moved for reconsideration under Fed. R. Civ. P. 59(e) and 60(b), and submitted the proposed TCAC.[6] Defendants opposed. CD75;

---

[5]    SPA1-SPA30(CD59). The district court dismissed the §12(a)(2) claims without prejudice, holding that plaintiffs had not adequately pleaded purchase in the offerings rather than the secondary market. SPA30(CD59:26). Plaintiffs cured that defect, JA460-JA462(TCAC¶¶16-19), as in *Barclays*, 734 F.3d at 141.

[6]    JA416-JA631 (CD72-74). The TCAC was styled as a "third" consolidated amended complaint because the district court directed plaintiffs to file a second amended complaint within 30 days of the August 2011 order. SPA30(CD59:30).

- 23 -

JA632-JA745(CD76).  On May 15, 2013, the district court found that plaintiffs'
motion was timely filed under Rule 59(e) but denied it on the merits.  SPA43-
SPA49(CD78).  Plaintiffs timely appealed on June 13, 2013.  JA753-JA758(CD80).

### C.    Relevant Orders

#### 1.    Introduction

The district court entered three relevant orders.  First, it denied, in pertinent
part, defendants' motion to dismiss as to the May, July, and November 2007 offerings,
as well as the February and May 2008 offerings.  SPA1-SPA30(CD59).  Second, the
district court granted defendants' motion for reconsideration, dismissing the CAC
with prejudice and denying leave to amend.  SPA31-SPA36(CD70).  Third, it denied
plaintiffs' motion to reconsider the dismissal with prejudice and did not allow
plaintiffs to file the proposed TCAC.  SPA43-SPA49(CD78).

#### 2.    Denial of the Motion to Dismiss the CAC

On August 11, 2011, the district court denied defendants' motion to dismiss as
to the May, July, and November 2007 offerings, as well as the February and May
2008 offerings.  SPA15-SPA24(CD59:15-24).  As to the 2007 offerings, the court
recognized that plaintiffs alleged that "(a) the Company failed to disclose its more
than €20 billion exposure to the high-risk subprime and nonprime residential

---

Plaintiffs complied, JA337-JA403(CD65), but the district court subsequently
reconsidered that order.  SPA31-SPA36(CD70).

899330_1

mortgage markets; (b) the disclosures about market risk and credit risk misrepresented the Company's true exposure to RMBS/CDO securities; and (c) the 2006 20-F[, incorporated into each offering,] did not comply with GAAP." SPA17(CD59:17 (citing JA51-JA52(CAC¶90))). JA52(CAC¶90) further incorporated additional paragraphs of the CAC alleging numerous violations of GAAP and IFRS principles, as well as of SEC regulations, relating to both disclosure duties and valuation issues. JA51-JA52(CAC¶90) (citing JA44-JA47(CAC¶¶68-75)).

The district court summarized several of the issues raised by plaintiffs' allegations, noting allegations describing DB's €3.46 billion CDO exposure, €9 billion monoline insurer counterparty exposure, and €9.7 billion exposure to RMBS backed by subprime and nonprime mortgages as a concentration of credit risk in the midst of a deteriorating market. SPA17-SPA18(CD59:17-18). It also recited two of the valuation issues plaintiffs alleged, namely that DB "valued its subprime and mortgage-backed assets based on subjective internal estimates that were clearly inconsistent with current market conditions," SPA18(CD59:18), and that DB's write-down of only €1.6 billion in October 2007 could not be reconciled with the collapse of the ABX and TABX indices beginning by February 2007. *Id.*

While defendants claimed they had no duty to "'disaggregate' or quantify the particular types or quality of [DB]'s mortgage-related holdings," the district court

disagreed, finding "[t]he CAC alleges specific facts about the Company's subprime holdings and trends in the subprime market that put those holdings at risk." SPA18-SPA19(CD59:18-19). Noting that defendants "make no attempt to argue that the CAC fails to allege adequately the materiality of the omitted information," the court concluded "that the CAC adequately pleads that the Offering Materials for the 2007 Offerings were materially misleading." SPA19(CD59:19).

The district court reached a similar conclusion as to the February 2008 offering, which also incorporated the 2006 20-F. SPA19-SPA22(CD59:19-22). The court observed that plaintiffs alleged additional misstatements in the February 7, 2008 Form 6-K, incorporated by reference in the February 2008 offering, including the 6-K's assertions that in the fourth quarter, DB "'had no net write-downs related to sub-prime, CDO or RMBS exposures,'" to offset its "'robust earnings.'" SPA20(CD59:20). Although the district court rejected claims related to proprietary trading and risk-management procedures, it concluded that, "[r]egarding the Company's alleged failure to account properly for its mortgage-related holdings and disclose risks related to those holdings, . . . , the Court finds the CAC has adequately pled a misstatement or omission, for the same reasons noted in the discussion of the 2007 Offerings, *supra*." SPA22(CD59:22).

- 26 -

Turning to the May 2008 offering, the district court again rejected claims related to proprietary trading and risk-management procedures, SPA22-SPA23(CD59:22-23), as well as a claim that DB did not adequately disclose the notional value of its monoline insurer exposure. SPA24(CD59:24). The court accepted, however, plaintiffs' contention that DB's statements regarding its VaR, DB's "'primary metric'" in managing trading market risks, were misleading. SPA23(CD59:23). DB's 2007 20-F stated that "the Company's equities trading VaR ranged between $43.5 million and $90.5 million in 2007," and "that 'trading market risk outside of these units is immaterial.'" SPA23(CD59:23) (quoting JA76(CAC¶162)). The district court found that the fact that DB reported trading losses in 2008 of $630 million – almost 700% above VaR – stated a claim. SPA23-SPA24(CD59:23-24).

### 3. Defendants' Motion for Reconsideration

Defendants moved for reconsideration based upon *Fait v. Regions Fin. Corp.*, 655 F.3d 105 (2d Cir. 2011), decided shortly after the initial motion was denied. Focusing solely upon the valuation issues raised by plaintiffs and ignoring the disclosure-based claims, the district court granted reconsideration on August 10, 2012, reasoning that because DB's valuations of its assets were opinions and plaintiffs alleged that DB's VaR "metrics were 'false' and that 'they failed to reflect the actual

- 27 -

risk,'" *Fait* required "Plaintiffs [to] allege that Defendants did not honestly believe those valuations when made." SPA35(CD70:5). The CAC "contains no such allegations." *Id.* More generally, the district court also found that because the CAC's claims "'exclusively rely on theories of strict liability and negligence,'" *id.* (quoting JA27(CAC¶1)), its claims were not "based on knowing misconduct by the Defendants," a "fatal" flaw under *Fait*. SPA35(CD70:5).

Based upon that same reasoning, the district court held that "amendment would be futile," and dismissed plaintiffs' claims with prejudice and without leave to replead. SPA36(CD70:6). It reasoned that because "Plaintiffs specifically state that none of their allegations are based on knowing misconduct, and the challenged statements amount to opinions which cannot form the basis of claims under the Securities Act unless Defendants subjectively disbelieved those opinions, amendment would be futile." *Id.* Judgment was entered on August 17, 2012. SPA37-SPA42(CD71).

### 4. Plaintiffs' Motion for Reconsideration

Within 28 days of judgment, on September 13, 2012, plaintiffs moved for reconsideration, submitting the proposed TCAC. JA416-JA631(CD72-74). The district court found the motion timely made under Rules 59(e) and 60(b), and analyzed it under Rule 59(e). SPA44-SPA46(CD78:2-4 & n.2). Although plaintiffs' motion

- 28 -

immediately followed the district court's determination that *Fait* required reconsideration of its initial order, the district court ruled *Fait* "does not constitute an intervening change in controlling law" because it was decided nearly a year earlier (approximately the amount of time the district court took to decide defendants' *Fait*-based reconsideration motion) – even though the reconsideration order marked the district court's first determination that *Fait* applied to the CAC.  SPA46(CD78:4).  It similarly concluded that the evidence cited in plaintiffs' motion, SPA47(CD78:5) (citing JA437-JA438(CD73:11-12)), was not "new" or "newly discovered" because it "was available prior to" the judgment being filed.  SPA47(CD78:5).  Based upon those determinations, as well as its conclusion that plaintiffs had not demonstrated "the need to correct a clear error or prevent manifest injustice," the district court denied the motion "with prejudice and without leave to amend."   SPA48-SPA49(CD78:6-7).  Although plaintiffs requested leave to file the proposed TCAC, JA427-JA432(CD73:1-6), the district court did not address that request, even though plaintiffs explained that the court's previous futility ruling contravened *Fait*.  JA440-JA442(CD73:14-16).

## IV.   SUMMARY OF ARGUMENT

Plaintiffs' arguments proceed on two tracks, one based upon the CAC's allegations, and one that incorporates the TCAC's additional factual allegations.

- 29 -

First, and based solely upon the allegations contained in the CAC, plaintiffs contend that the district court erred in dismissing the CAC in its reconsideration order. That order, the second in the district court's series of three orders, addresses only plaintiffs' valuation-based claims, which the district court ruled were defective under *Fait*, 655 F.3d 105, because plaintiffs did not, in the district court's view, adequately plead that defendants did not subjectively believe their valuation opinions.

Even assuming that the district court was correct, its *Fait*-based analysis has no application to plaintiffs' disclosure-based arguments. Specifically, plaintiffs contend that, under the facts alleged in the CAC, Item 503 and various accounting principles required DB to disclose its €20 billion exposure to risky subprime/nonprime mortgage-related assets because the financial crisis that threatened their value manifested itself long before the first offering. Indeed, the delinquency and foreclosure rates for subprime borrowers – the types of borrowers whose loans collateralized DB's assets – began to skyrocket in 2006, long before the first offering in May 2007. Additionally, numerous subprime lenders declared bankruptcy in early 2007, and the ABX/TABX indices revealed significant losses in value before May of that year. These facts "made it clear to defendants that the value of DB's subprime/nonprime-backed RMBS/CDOs and other subprime/nonprime-related assets had declined significantly prior to the May 2007 Offering." JA60-JA61(CAC¶113).

- 30 -

Because "Item 503 . . . is intended 'to provide investors with a clear and concise summary of the material risks to an investment in the issuer's securities,'" *Silverstrand Invs. v. AMAG Pharms., Inc.*, 707 F.3d 95, 103 (1st Cir. 2013), *cert. denied*, __ U.S. __, 2013 U.S. LEXIS 6984 (2013), defendants were obligated to disclose DB's exposure prior to the May 2007 offering, a duty that only became more acute with each successive offering in July and November 2007 and February 2008 because of the worsening financial crisis. Various accounting principles similarly required disclosure.

The district court also erred in reconsidering its ruling that DB's VaR criteria were misleading because DB grossly exceeded its VaR range and stated that losses outside that range were immaterial, yet its actual losses were 700% above the high end of the VaR range. The district court's application of *Fait* to those facts was error because plaintiffs' claims were not based on opinions.

Plaintiffs' second constellation of arguments concerns the district court's erroneous ruling that amendment was futile because the CAC disavowed pleading knowing misconduct by defendants, and its refusal to permit plaintiffs to file the TCAC. The district court's futility analysis was rejected in *Barclays*, 734 F.3d at 141, which held, in nearly identical circumstances, that alleging that an opinion was not honestly held does not require scienter. It was error to refuse to allow plaintiffs to

- 31 -

amend to seek to comply with *Fait*.  Additionally, the denial of plaintiffs' reconsideration motion offered no justification for denying leave to file the TCAC. That is error under *Foman v. Davis*, 371 U.S. 178, 182 (1962).

The additional facts in the TCAC demonstrate that defendants were well aware, prior to the first offering, of the serious threat posed by the financial crisis to the viability of its subprime/nonprime mortgage-based assets.  While numerous facts alleged in the TCAC demonstrate that fact, the most compelling is that by early 2007, DB's highest levels of management approved a $5 billion short position against subprime/nonprime mortgage-based assets, the very types of assets to which DB had €20 billion exposure.  Thus, before the first offering, DB knew that its assets had lost value and were so likely to continue to lose value that a $5 billion short position was judged prudent by DB's Executive Committee.  Therefore, in compliance with *Fait*, plaintiffs adequately pleaded defendants' subjective disbelief of their valuation opinions as to all five offerings.  Similarly, DB's obligation to disclose its exposure under Item 503 and accounting principles was even more clear.

The TCAC also added a claim under Item 303, under which "a registrant must '[d]escribe any known trends or uncertainties . . . that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations.'"  *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716 (2d Cir.

2011), *cert. denied*, __ U.S.__, 132 S. Ct. 242 (2011).  A financial crisis that prompted DB to enter a $5 billion short position is clearly such a trend.

Lastly, the TCAC addressed the district court's VaR ruling by alleging that DB subjectively disbelieved its VaR analysis.

## V.    ARGUMENT

### A.    The Offering Materials Failed to Disclose DB's €20 Billion Exposure to Highly Risky Subprime/Nonprime Assets

#### 1.    Standard of Review and Introduction

This Court reviews a Fed. R. Civ. P. 12(b)(6) dismissal de novo, accepting the complaint's factual allegations, and drawing all reasonable inferences in plaintiffs' favor.  *Litwin*, 634 F.3d at 715.

Section 11 provides for liability if a registration statement, as of its effective date, contains: "(1) a misrepresentation; (2) an omission in contravention of an affirmative legal disclosure obligation; [or] (3) an omission of information that is necessary to prevent existing disclosures from being misleading."  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010).  Section 11 "creates a private action for damages when a registration statement includes untrue statements of material facts or fails to state material facts necessary to make the statements therein not misleading," such that "the issuer of the securities is held absolutely liable," without regard to fault. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 207-08 (1976).

- 33 -

"Section 12(a)(2) imposes liability under similar circumstances on issuers or sellers of securities by means of a prospectus." *Litwin*, 634 F.3d at 715. "To establish § 15 liability, a plaintiff must show a 'primary violation' of § 11 and control of the primary violator by defendants." *In re Lehman Bros. Mortgage-Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011).

Section 11 "places a relatively minimal burden on a plaintiff." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). "If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case." *Id.* "The section was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Id.* at 381-82 (footnote omitted). "Liability against the issuer of a security is virtually absolute, even for innocent misstatements." *Id.* at 382 (footnote omitted). "Other defendants" including the issuer's directors, underwriters, and persons who sign the registration statement, "bear the burden of demonstrating due diligence." *Id.*

Because fraud is no element of plaintiffs' §11 claims, ordinary notice-pleading principles apply, requiring but "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement need only "'give the defendant fair notice of what the . . . claim is and the

- 34 -

grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### 2. Item 503 Required Disclosure of DB's €20 Billion Exposure to Highly Risky Subprime/Nonprime Assets

Item 503 of SEC Regulation S-K requires "mandatory risk disclosures," *see Seow Lin v. Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d 408, 417 (S.D.N.Y. 2008), that obligated DB to disclose the nature of its mortgage-related holdings.  JA30, JA46, JA51, JA63(CAC¶¶7, 73, 90(a)-(b), 124(a)-(b)).  Failure to comply with "an affirmative legal disclosure obligation" imposed by an SEC regulation supports liability under §11.  *See generally Litwin*, 634 F.3d at 715-16.  "[A]n actionable §11 omission may arise when a registration statement fails to comply with Item 303 or 503 of SEC Regulation S-K."  *Silverstrand*, 707 F.3d at 102; *accord City of Roseville Emps. Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 426 (S.D.N.Y. 2011); *see also Litwin*, 634 F.3d at 716 (Item 303 claim).

Section 503 requires "a discussion of the most significant factors that make the offering speculative or risky."  17 C.F.R. §229.503(c).  "Item 503 . . . is intended 'to provide investors with a clear and concise summary of the material risks to an investment in the issuer's securities.'"  *Silverstrand*, 707 F.3d at 103 (quoting

- 35 -

Securities Offering Reform, SEC Release No. 8501, 2004 WL 2610458, at *86 (Nov. 3, 2004)).  The requisite disclosure "must 'describe the most significant factors that may adversely affect the issuer's business, operations, industry or financial position, or its future financial performance.'"  *Id.* (quoting *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 690 (S.D.N.Y. 2004)).  The "'discussion of risk factors . . . "should explain how the risk affects . . . the securities being offered."'"  *Id.*  But more colloquially, "the inquiry involves 'whether the Offering Documents were accurate and sufficiently candid.'"  *EnergySolutions*, 814 F. Supp. 2d at 426 (quoting *Lin*, 574 F. Supp. 2d at 417).  The Offering Materials here, omitting DB's €20 billion subprime/nonprime exposure despite an increasingly severe crisis in the U.S. housing market, were neither "accurate" nor "candid."

To state a claim, plaintiffs must "allege sufficient facts to infer that a registrant knew, as of the time of an offering, that (1) a risk factor existed; (2) the risk factor could adversely [a]ffect the registrant's present or future business expectations; and (3) the offering documents failed to disclose the risk factor."  *Silverstrand*, 707 F.3d at 103.  Although the district court addressed, in a ruling that is not part of the instant appeal, Item 503 in the course of rejecting plaintiffs' claims arising from an October 2006 offering, SPA10-SPA11(CD59:10-11), the district court did not analyze Item 503 in its initial decision sustaining plaintiffs' claims on the 2007 and 2008 offerings.

899330_1

SPA15-SPA22(CD59:15-22).    Similarly, the district court's order granting defendants' motion for reconsideration also failed to address Item 503.    SPA34-SPA35(CD70:4-5).    Rather, it applied this Court's decision in *Fait* to plaintiffs' valuation-based claims, finding that "such valuations are matter[s] of opinion rather than fact."    SPA35(CD70:5).

Item 503 imposes an affirmative disclosure obligation that does not turn on DB's opinions as to the valuation of its assets; it addresses the different concern of whether there is a "risk factor" that that "***could*** adversely [a]ffect the registrant's present or future business expectations."    *See Silverstrand*, 707 F.3d at 103 (emphasis added).    Thus, even if DB could have subjectively believed its assets were somehow impervious to the effects of the collapsing real estate market, such an opinion says nothing about whether the assets constituted a "risk factor" under the dire – and worsening – economic conditions prevailing on the dates of the various offerings.    In short, Item 503's affirmative disclosure obligation is violated, and §11 imposes liability, if plaintiffs "allege sufficient facts to infer that a registrant knew, as of the time of an offering, that (1) a risk factor existed; [and] (2) [it] could adversely [a]ffect the registrant's present or future business expectations."    *Id.*; *accord In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 443 (S.D.N.Y. 2009).    Plaintiffs plainly

- 37 -

satisfied those objective criteria as to the three 2007 offerings as well as the February 2008 offering.

There were certainly "sufficient facts to infer that [DB] knew, as of the time of [the] offering[s]," *see Silverstrand*, 707 F.3d at 103, that DB's €20 billion exposure to the U.S. real estate market constituted a "risk factor." JA54(CAC¶96). That exposure consisted of €3.46 billion in CDOs backed primarily by subprime/nonprime mortgages, including €1.1 billion in highly risky mezzanine CDOs; €9 billion of net counterparty exposures to monoline insurers; and €9.7 billion exposure directly through RMBS. JA54-JA56(CAC¶¶97-102). Much of DB's subprime collateral was originated in 2006 and 2007, vintages for which mortgage default rates were more than double the loss rates of 2005 and earlier vintages. JA56(CAC¶102). Indeed, the subprime crisis manifested itself months before the first offering: by September 2006, the number of properties that had entered into foreclosure had increased 53% from a year earlier; by November 2006, subprime loans made in 2006 were "going bad" at a rate 50% higher than those originated in 2005; and by December 2006, subprime borrowers had a 12.5% delinquency rate for the third quarter, the highest in over three years. JA57-JA58(CAC¶105). Thus, prior to *any* of the offerings, DB knew its subprime holdings subjected it to grave risk in the midst of a collapsing real estate market.

As of the May 2007 offering, defendants were aware of numerous facts indicating that DB's substantial subprime/nonprime exposure was a major risk factor. By that point, the degradation of the real estate market was in full swing: delinquency and foreclosure rates were skyrocketing by 2006, and numerous subprime lenders declared bankruptcy in early 2007. JA57-JA58(CAC¶105). Similarly, prior to the May offering, in early 2007, the ABX index dropped significantly and the TABX index revealed that CDO values were more than 15% under par. JA59-JA60(CAC¶¶111-112). These indices are properly considered at the motion-to-dismiss stage. *See In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 236 (S.D.N.Y. 2010) (rejecting defendants' objections to consideration of the ABX and TABX indices as "amount[ing] to factual disputes").

Plaintiffs specifically alleged that these facts "made it clear to defendants that the value of DB's subprime/nonprime-backed RMBS/CDOs and other subprime/nonprime-related assets had declined significantly prior to the May 2007 Offering." JA60(CAC¶113). Moreover, the CAC alleged that DB was aware that its €20 billion in mortgage-related holdings were "highly susceptible to the adverse events occurring in the U.S. subprime real estate market," and of their "increasing illiquidity," as well as the fact that "warning signs demonstrat[ed] the U.S. subprime crisis directly affected the collateral underlying DB's subprime-backed assets." JA54(CAC¶95).

- 39 -

Plaintiffs thus "allege[d] sufficient facts to infer that [DB] knew, as of the time of [the May 2007] offering, that" its €20 billion subprime/nonprime exposure constituted "a risk factor" that "could adversely [a]ffect [DB]'s present or future business expectations." *See Silverstrand*, 707 F.3d at 103; *accord Citiline Holdings, Inc. v. iStar Fin., Inc.*, 701 F. Supp. 2d 506, 514-15 & n.2 (S.D.N.Y. 2010) (finding a violation of Item 503 when defendants failed "sufficient[ly] to warn the market of [their] deteriorating performance").

Nor did defendants contend below that the risk posed by DB's enormous subprime/nonprime exposure somehow was not material. SPA19(CD59:19). Any such argument would have been unavailing. In a similar case involving failure to disclose or adequately to value subprime/nonprime assets, this Court held that "[i]n a quickly deteriorating credit market, we believe the particulars about a firm's exposure to that market could assume a level of importance, and hence materiality, that may not have been the case in less economically stressful times." *Barclays*, 734 F.3d at 140.

The inference that DB was aware of a "risk factor [that] could adversely [a]ffect [DB]'s present or future business expectations," *see Silverstrand*, 707 F.3d at 103, is even more compelling as to the July offering: in addition to all of the factors supporting the inference as of the May offering, the ABX and TABX indices continued their freefall. JA59-JA60(CAC¶¶111-112). Indeed, by June 29, 2007,

- 40 -

CDO values were more than 30% below par. JA60(CAC¶112). Yet DB still did not disclose the risk posed by its toxic assets, JA60-JA61(CAC¶¶113-114), in violation of Item 503's disclosure obligation.

By the November offering, the inference that DB's subprime/nonprime assets were "significant factors that make the offering speculative or risky," 17 C.F.R. §229.503(c), was inescapable. By that time, the ABX and TABX indices had collapsed, JA59-JA61(CAC¶¶111-113), and there was a steady drum beat of huge losses suffered by DB's peer institutions: in October 2007, Merrill Lynch wrote down its ABS CDOs by $12.4 billion, and UBS wrote down $4.4 billion in subprime-related RMBS and CDOs. JA61(CAC¶115); *see also* JA61(CAC¶116) (November 2007 losses by Morgan Stanley, Bank of America, and Citigroup). Again, the inference that DB was aware of a risk factor requiring disclosure under Item 503 is inescapable. Yet it did not disclose its enormous exposure as a risk factor. JA61(CAC¶114).

Finally, by the February 2008 offering, the crisis had accelerated. In late 2007, and continuing through February 2008, peer institutions continued to report dramatic losses. JA61-JA62(CAC¶¶117-118). Falling property values and increasing rates of default in the mortgages underlying mortgage-backed securities rendered those securities illiquid. JA62(CAC¶120). The result was that "the value of DB's subprime and nonprime RMBS/CDO portfolios plummeted," and market conditions caused the

value of DB's subprime and nonprime RMBS/CDO portfolios to plummet. *Id.* DB's portfolio thus plainly rendered its February 2008 offering "speculative or risky," 17 C.F.R. §229.503(c), yet there was no disclosure. JA63, JA65(CAC¶¶124(a)-(b), 129(a)).

### 3. Both GAAP and IFRS Rules Required Disclosure of DB's €20 Billion Exposure to Highly Risky Subprime/Nonprime Assets

In addition to Item 503, defendants were obligated by GAAP and IFRS to disclose DB's €20 billion in high-risk subprime and nonprime mortgage-backed securities and the associated risks. JA28-JA30, JA44-JA47, JA51-JA56, JA60-JA61, JA65-JA69(CAC¶¶3, 7, 68-75, 90(a)-(b), 96, 100, 113, 124, 129(a), 130-140). "The SEC treats the FASB's standards as authoritative," *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 160 n.4 (2d Cir. 2000), and "'[f]inancial statements filed with the [SEC] which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate. . . .'" *United States v. Ebbers*, 458 F.3d 110, 125 (2d Cir. 2006) (quoting 17 C.F.R. §210.4-01(a)(1)). Moreover, defendants' disclosure duties are fully applicable to the interim reports incorporated in the various offerings. *See* Accounting Principles Board Opinion No. 28 (requiring interim disclosures of significant concentrations of risk); Article 10-01 of Regulation S-X, 17 C.F.R. §210.10-01 ("where material contingencies exist, disclosure of such

- 42 -

matters shall be provided [in interim financial statements] even though a significant change since year end may not have occurred").

"'Whether GAAP has been violated is a fact-specific issue' which '[f]requently . . . turns on expert testimony.'" *In re Citigroup Bond Litig.*, 723 F. Supp. 2d 568, 595 (S.D.N.Y. 2010) (quoting *SEC v. Caserta*, 75 F. Supp. 2d 79, 91 (E.D.N.Y. 1999)). Consequently, "[w]hether or not defendants' financial statements actually violated various provisions of GAAP – and thus whether the representation that the financial statements complied with GAAP was actually an 'untrue' statement – are not issues for resolution at [the motion-to-dismiss] stage." *Id.* at 594; *accord In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1421 (3d Cir. 1997); *In re Ambac Fin. Grp.*, 693 F. Supp. 2d 241, 273 (S.D.N.Y. 2010). Defendants represented that DB's 2006 20-F, which was incorporated by reference in all of the offerings, complied with GAAP, JA50(CAC¶88), and DB was also required to comply with IFRS principles beginning with fiscal year 2007. JA65-JA66(CAC¶¶130-133). The CAC explains that DB did not, in fact, comply. JA28-JA30, JA44-JA47, JA51-JA52, JA54-JA55, JA60-JA61, JA63, JA65-JA69(CAC¶¶3, 7, 68-72, 75, 90, 95-96, 100, 113, 124, 128-129, 134-140).

The same factual predicate that imposed an Item 503 disclosure duty also requires disclosure under GAAP and IFRS principles as to each of the offerings at

- 43 -

issue. The precipitous decline in the ABX and TABX indices was particularly significant as it "made it clear to defendants that the value of DB's subprime/nonprime-backed RMBS/CDOs and other subprime/nonprime-related assets had declined significantly *prior to the May 2007 Offering*." JA60-JA61(CAC¶113) (emphasis added). Similarly, DB's awareness of the facts that its €20 billion in mortgage-related holdings were "highly susceptible to the adverse events occurring in the U.S. subprime real estate market," JA54(CAC¶95(a)), and "increasing[ly] illiquid[]," as well as the fact that "warning signs demonstrat[ed] the U.S. subprime crisis directly affected the collateral underlying DB's subprime-backed assets," JA54(CAC¶¶95(a)-(c)), also compelled disclosures under the principles set forth below.

Paragraph 15A of FASB Statement of Financial Accounting Standards ("SFAS") No. 107, *Disclosures about Fair Value of Financial Instruments*, required DB to disclose "all significant concentrations of credit risk arising from all financial instruments, whether from an individual counterparty or groups of counterparties" (original emphasis omitted). Similarly, Statement of Position ("SOP") No. 94-6 requires disclosures regarding vulnerabilities arising from exposures "to certain risks and uncertainties that might have a 'severe impact' on future operations," JA46(CAC¶72) (quoting SOP 94-6), and SOP 94-6-1 makes clear that SOP 94-6

- 44 -

applies to "loan products," and requires "disclosure of 'concentrations in revenue from particular products.'"[7]

Both SFAS No. 107 and SOP 94-6 require disclosure here, where DB's exposure to risky subprime/nonprime assets was at least €20 billion and DB was aware of the grave risk these assets posed as set forth in JA54, JA59-JA60(CAC¶¶95(a)-(c)), 113. Here, as in *Citigroup Bond*, failure to disclose DB's "direct subprime exposure" stated a claim under these provisions. *See* 723 F. Supp. 2d at 594.

The district court's finding that plaintiffs' allegation of a concentration of risk was merely a "legal conclusion" applies only to the October 2006 offering which is not at issue here.[8] Rather, the district court's finding that "[t]he CAC alleges specific facts about the Company's subprime holdings and trends in the subprime market that put those holdings at risk," SPA19(CD59:19) (citing *Citigroup Inc.*, 753 F. Supp. 2d at 235), demonstrates that it effectively found the requisite concentration of credit risk

---

[7]     SOP 94-6-1(¶11) (quoting SOP 94-6). The district court in *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 290 (S.D.N.Y. 2011), held that "[t]he disclosure requirements of SOP 94-6 did not apply to Alt-A assets, commercial real estate assets, or leveraged loans," but SOP 94-6-1(¶11) unambiguously states that SOP 94-6 applies to "loan products."

[8]     SPA10(CD59:10). The district court's only other mention of SFAS No. 107 was in the context of plaintiffs' valuation claims, not the disclosure claims addressed here. SPA18(CD59:18).

- 45 -

for a disclosure obligation to arise under SFAS No. 107 and SOP 94-6 as to the 2007 and February 2008 offerings.  Given DB's €20 billion exposure, that risk was plainly significant.  The district court's ruling on reconsideration does not undermine its risk assessment; that holding was limited to concluding that *Fait* requires valuation claims to be supported by allegations that defendants did not believe their valuation opinions.  SPA34-SPA35(CD70:4-5).  Because the instant GAAP and IFRS claims turn on risk assessment rather than valuation, the district court's *Fait* analysis does not vitiate the disclosure duty arising from DB's subprime/nonprime holdings.

Nor does *Lehman*'s flawed analysis shield defendants from the duty to disclose the concentration of risk posed by DB's exposure to €20 billion in precarious mortgage-based assets.  *Lehman* held that "the question whether a particular concentration of credit risk is 'significant' within the meaning of SFAS 107 is a matter of judgment."  799 F. Supp. 2d at 291.  "[A] plaintiff must plead facts that would permit findings that the entity in fact had 'significant concentrations of credit risk' *and* that the entity believed that to be so."  *Id*. (emphasis in original).  But the only authority *Lehman* cites for that proposition is SOP 94-6-1's statement that "'[j]udgment is required to determine whether loan products have terms that give rise to a concentration of credit risk.'"  *Id.* at n.223 (quoting SOP 94-6-1).  That guidance says nothing about analyzing "significance"; it is plainly directed to the determination

- 46 -

whether "terms" of "loan products" result in "a concentration of credit risk." *See id.* Plaintiffs have satisfied that criterion, pleading facts demonstrating that DB knew of the risk posed by its subprime/nonprime "loan products." JA54, JA60-JA61(CAC¶¶95, 113).  Indeed, nothing in SOP 94-6-1 suggests that the "significance" inquiry is anything other than objective, and the objective significance of DB's €20 billion exposure is not subject to reasonable dispute.

GAAP also requires that financial statements disclose contingencies when it is at least reasonably possible (*e.g.*, more than a slight chance) that a loss may have occurred.  SFAS No. 5, ¶10.  The court in *Citigroup Bond* found that plaintiffs' allegations under SFAS No. 5 regarding Citigroup's failure to disclose its "direct subprime exposure" also stated a claim.  *See* 723 F. Supp. 2d at 594.  This Court should reach the same conclusion.  SFAS No. 5 "'requires that loss be accrued whenever it is probable a loss has been incurred or an asset impaired and the amount of the loss can be reasonably estimated.  If the loss is at least reasonably possible, but no reasonable estimate can be made, the contingency at a minimum should be disclosed.'"  *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 677-78 (6th Cir. 2005).  Given that plaintiffs alleged that it was "clear to defendants that the value of DB's subprime/nonprime-backed RMBS/CDOs and other subprime/nonprime-related assets had declined significantly prior to the May 2007 Offering,"  JA60-

- 47 -

JA61(CAC¶113), defendants were certainly aware that a "loss [was] at least reasonably possible." *See Bridgestone*, 399 F.3d at 677-78. Similarly, defendants were aware of the harmful effects of the collapse of the subprime market on its mortgage-based assets, JA54(CAC¶¶95(a)-(d)), from which an inference of knowledge of a reasonable possibility of a loss could easily be drawn. *See Twombly*, 550 U.S. at 562 (analyzing whether the complaint "'contain[s] either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory'").

Disclosure was also required under IFRS 7, which operates similarly, for the same reasons disclosure was mandated by SFAS Nos. 107 and 5. IFRS 7 directs that "[a]n entity shall disclose information that enables users of its financial statements to evaluate the nature and extent of risks arising from financial instruments to which the entity is exposed at the end of the reporting period." *Id.* It mandates disclosure of "the exposures to risk and how they arise." *Id.*; *see also* IAS 30 (requiring disclosure of "significant concentrations of its assets," which "shall be made in terms of concentrations of risk"). Such risks, IFRS 7 cautions, "typically include . . . credit risk, liquidity risk and market risk." *Id.* In short, DB's exposure to €20 billion in subprime/nonprime assets presented substantial risks – of which it was aware before even the May 2007 offering – which it was required to disclose by a host of

- 48 -

accounting principles.  Because plaintiffs have alleged defendants' failure to make the requisite disclosures, the district court erred in dismissing the CAC.

### 4. *Fait* Does Not Apply to Plaintiffs' Claims that DB's VaR Assurances Were Misleading

DB's 2007 20-F stated that DB's equities trading VaR ranged between $43.5 million and $90.5 million during 2007.  JA76(CAC¶162).  DB assured investors of the significance of its VaR calculations, unconditionally stating that its "'trading market risk outside of these units is immaterial.'"  *Id*.  Yet DB reported equities trading losses for 2008 almost 700% above the high end of its reported VaR range of $90.5 million. *Id*.

The district court initially recognized that "these factual allegations of trading vastly in excess of stated VaR limits are sufficient to state a claim."  CD59:23 (citing *Lehman*, 799 F. Supp. 2d at 286-87).  Indeed, *Lehman* found that "routine breaches of VaR limits . . . are sufficient to permit a reasonable trier of fact to conclude that the statements in the Offering Materials were materially misleading."  799 F. Supp. 2d at 287.  The same is true here, where losses exceeded the high end of the VaR range by 700% despite DB's assurances.  JA76(CAC¶162).

The district court nonetheless reconsidered that ruling as well, concluding *Fait* applied to plaintiffs' allegations that the VaR "metrics were 'false' and that 'they failed to reflect the actual risk associated with the Company's equities trading.'"

- 49 -

SPA35(CD70:5 (quoting JA72(CAC¶149))). It reasoned that these allegations implicated DB's subjective valuation of its assets, requiring "alleg[ations] that Defendants did not honestly believe those valuations when made." SPA35(CD70:5). But the district court's initial finding that DB's VaR assurances were misleading because DB's trading losses grossly exceeded its VaR range did not involve such opinions, but rather "*factual allegations* of trading vastly in excess of stated VaR limits." SPA23(CD59:23) (emphasis added). *Lehman* also relied upon "*factual allegations* of routine breaches of VaR limits." 799 F. Supp. 2d at 287 (emphasis added). Opinion played no role; *Fait* is therefore inapposite.

DB's statement as to its VaR range that its "'trading market risk outside of these units is immaterial'" is unconditional. JA76(CAC¶162). *Fait* excludes such statements from its analysis because the complaint there did not allege assurances that "were stated as guarantees." 655 F.3d at 110 n.3 (citing *In re IBM Corporate Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998)). *IBM* holds that "[s]tatements regarding projections of future performance may be actionable under Section 10(b) or Rule 10b-5 if they are worded as guarantees." 163 F.3d at 107. *Fait* thus does not apply to DB's unconditional VaR statement.

**B.**    ***Barclays* Demonstrates that the District Court's Futility Analysis Was Erroneous and that Plaintiffs Should Have Been Permitted to Amend their Complaint to Comply With the District Court's Analysis of *Fait***

**1.    Standard of Review**

The district court concluded its order granting defendants' motion for reconsideration by holding that because "Plaintiffs specifically state that none of their allegations are based on knowing misconduct, and the challenged statements amount to opinions which cannot form the basis of claims under the Securities Act unless Defendants subjectively disbelieved those opinions, amendment would be futile." SPA36(CD70:6). Although plaintiffs' subsequent motion for reconsideration sought leave to file the TCAC, JA427-JA432, JA440-JA442(CD73:1-6, 14-16), the district court did not revisit its futility determination. *Barclays* held that "[a]lthough we ordinarily review a denial of reconsideration under an abuse-of-discretion standard, because the denial here was dependent on the district court's determination that amendment would be futile, we review the denial *de novo*." 734 F.3d at 138.

In evaluating futility, facts taken from the proposed TCAC are accepted as true, and all inferences are drawn in favor of the pleader. *See Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012).

### 2. *Barclays* Rejected the District Court's Futility Analysis

In *Barclays*, as here, the district court dismissed valuation-based claims because the valuations "were based on subjective determinations and were therefore not actionable absent plausible allegations that defendants disbelieved the subjective valuations at the time they made them." 734 F.3d at 137. On a motion for reconsideration of the dismissal, plaintiffs sought leave to file a proposed amended complaint, which "alleged that the defendants did not believe that the writedowns Barclays took on its mortgage-related assets were sufficient." *Id*. The district court denied the motion as futile because such allegations would necessarily embrace §10(b) fraud, which plaintiffs had not pleaded. *See id.*

This Court rejected that analysis, stating "we believe the Proposed Complaint that Lead Plaintiffs later submitted adequately pled such allegations regarding the Series 5 Offering, and therefore the amendment should not have been denied as futile." *Id.* at 140; *see also Foman*, 371 U.S. at 182 (reversing denial of post-judgment motion for reconsideration in order to amend the complaint); *Williams v. Citigroup Inc.*, 659 F.3d 208, 214 (2d Cir. 2011) (same). With respect to the district court's futility analysis, this Court reasoned that *Fait*'s requirement that an opinion be "'both objectively false and disbelieved by the defendant at the time it was expressed,'" *Barclays*, 734 F.3d at 141 (quoting *Fait*, 655 F.3d at 110), is "not the

- 52 -

same as allegations of fraud." *Id.*  In short, "the pleading required for beliefs and opinions 'does not amount to requirement of scienter.'" *Id.* (quoting *Fait*, 655 F.3d at 112 n.5).  *Barclays* thus vindicated *Fait*'s explanation that "[w]e do not view a requirement that a plaintiff plausibly allege that defendant misstated his truly held belief and an allegation that defendant did so with fraudulent intent as one and the same." *See Fait*, 655 F.3d at 112 n.5.

The district court here took the opposite approach, finding that because plaintiffs disavowed "knowing misconduct," any attempt to plead that "Defendants subjectively disbelieved [their] opinions . . . would be futile."  SPA36(CD70:6).  But "knowing misconduct" connotes scienter.  *See Press v. Quick & Reilly, Inc.*, 218 F.3d 121, 130 (2d Cir. 2000) ("The scienter needed in connection with securities fraud is intent to deceive, manipulate or defraud, or knowing misconduct") (quotation omitted); *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 167 (2d Cir. 1980) ("[t]he Supreme Court defined scienter as 'knowing or intentional misconduct'") (quoting *Ernst & Ernst*, 425 U.S. at 197).  Yet "the pleading required for beliefs and opinions '***does not amount to requirement of scienter***.'" *Barclays*, 734 F.3d at 141 (quoting *Fait*, 655 F.3d at 112 n.5) (emphasis added).  By insisting that plaintiffs were required to plead "knowing misconduct," the district court erroneously imposed a scienter requirement that *Fait* and *Barclays* repudiated.  *See id*.

- 53 -

Moreover, "'an amended complaint ordinarily supersedes the original, and renders it of no legal effect.'" *Dluhos v. Floating & Abandoned Vessel*, 162 F.3d 63, 68 (2d Cir. 1998). The district court did not explain why the TCAC's embrace of allegations of knowledge, JA454(TCAC¶1), could not supersede the CAC.

Even if the district court had not made its futility determination in granting the defendants' reconsideration motion, its failure to provide any other rationale for denying plaintiffs leave to amend would still be error. "[E]ven after a party has amended its pleadings once, further leave to amend 'shall be freely given when justice so requires,' Fed. R. Civ. P. 15(a), and a district court's 'outright refusal to grant the leave without any justifying reason appearing for the denial is [an] abuse of . . . discretion.'" *Volvo N. Am. Corp. v. Men's Int'l Professional Tennis Council*, 857 F.2d 55, 75 (2d Cir. 1988) (quoting *Foman*, 371 U.S. at 182); *accord Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198-99 (2d Cir. 1990). Rule 15(a)'s "mandate is to be heeded." *Foman*, 371 U.S. at 182. The same is true post-judgment. *See Williams*, 659 F.3d at 214. Because the district court's order denying plaintiffs' request for leave to amend, SPA43-SPA49(CD78), "did not mention [plaintiffs'] offer to amend and gave no reason for denying it," *see Ronzani*, 899 F.2d at 198, remand is required in any event. *See id.* at 198-99.

### 3.    The TCAC Adequately Pleaded Valuation Claims

*Barclays* observed that "[t]o determine whether leave to amend should be granted, it is appropriate to take into account the nature of the amendment requested." 734 F.3d at 140; *but see Ronzani*, 899 F.2d at 199 (directing the district court to determine in the first instance whether the amended complaint was viable).  In analyzing whether the claim at issue in *Barclays* was "adequately pled," *see* 734 F.3d at 140, this Court emphasized that the offering took place in a "financial environment" that "had deteriorated markedly and was continuing to do so," and that peer institutions had suffered significant losses.  *See id.* at 139-40.  Even so, *Barclays* did not take write-downs prior to the offering, yet took a £2.8 billion write-down four months afterward.  *See id.* at 140.  This Court found that these allegations that "Barclays failed to make timely and adequate writedowns present facts sufficient to support a plausible claim that should be allowed to proceed."  *Id*.

The TCAC makes similar allegations as to all five offerings.  The TCAC, like the pleading in *Barclays*, contains substantial allegations regarding the "deteriorat[ing]" financial market, *see id.* at 139, including the adverse effect of the declining housing market on subprime/nonprime mortgages, JA456-JA457(TCAC¶¶5-6), increasing foreclosure rates and originator bankruptcies in 2007, TCAC¶98, the collapse of the ABX/TABX indices throughout 2007, JA489-JA492(TCAC¶¶99-106),

- 55 -

and massive losses by peer institutions in late 2007 and early 2008.  JA493-JA494(TCAC¶¶108-112).  As in *Barclays*, the TCAC also alleges that DB's write-downs were inadequate.  DB disclosed nothing about its subprime/nonprime exposure and took no write-downs as to the May and July 2007 offerings, and its write-down of €1.6 billion as of the November 2007 offering was inadequate.  JA476-JA480(TCAC¶80).  Its valuations of its assets in connection with the February 2008 offering were wrong, JA496-JA498(TCAC¶119), and its write-down of €885 million in connection with the May 2008 offering was inadequate.  JA503-JA504(TCAC¶¶134-135).  As in *Barclays*, DB was forced to take huge losses not long after the last offering was complete.  JA462-JA463, JA522-JA524, JA527-JA528(TCAC¶¶21, 181, 186).

Indeed, the district court here already effectively determined that plaintiffs satisfied this portion of *Barclays*' analysis as to the first four offerings.  It held, as to the 2007 offerings, that "[t]he CAC alleges specific facts about the Company's subprime holdings and trends in the subprime market that put those holdings at risk," and concluded "that the CAC adequately pleads that the Offering Materials for the 2007 Offerings were materially misleading."  SPA19(CD59:19).  And it made the same findings as to the February 2008 offering.  *Id*.  The facts alleged in the CAC that the district court relied upon, *see* SPA17-SPA20(CD59:17-20), are all repeated in

- 56 -

TCAC. *See* JA476-JA480(TCAC¶80) (disclosure duties and inaccurate valuations), JA484-JA485(TCAC¶87) (DB's failure to value its assets based on market conditions), JA486-JA490(TCAC¶¶90-98) (DB's holdings and concentration of risk allegations), JA490-JA492(TCAC¶¶100-106) (ABX/TABX indices), JA493(TCAC¶107) (the write-down in the November 1, 2007 Form 6-K), JA495-JA496(TCAC¶¶117-119) (claims arising from the February 2008 offering). The only basis for the district court's reconsideration of these determinations was its holding that plaintiffs failed to allege – and couldn't allege – that defendants did not honestly believe their valuations. SPA35-SPA36(CD70:5-6).

This Court addressed an essentially identical lower court ruling in *Barclays*, and approved the amended complaint proposed there. That proposed complaint "state[d] that, with respect to the values listed in the . . . Offering Materials, 'Barclays knowingly failed to properly write down its exposure.'" *Barclays*, 734 F. 3d at 140 (quotation omitted; original emphasis omitted). The new allegations were not conclusory: plaintiffs "alleged that prior to the . . . Offering, defendants were aware of Barclays's vulnerability to the adverse events in the mortgage and credit market yet failed to take adequate writedowns." *Id.* at 140-41. Those adverse events included the precipitous plunge in the ABX index in 2007. *See id.* at 141 n.4.

The showing in the TCAC far exceeds that found adequate in *Barclays*.  First, plaintiffs have alleged that defendants were subjectively aware that their valuation opinions were erroneous as to all five offerings.  JA455-JA456, JA458, JA476-JA480, JA496-JA498, JA504, JA512(TCAC¶¶3, 10-11, 80, 119, 135, 159).

Second, the TCAC's allegations of knowledge are plainly not conclusory; it alleges numerous facts demonstrating that "defendants were aware of [DB's] vulnerability to the adverse events in the mortgage and credit market."  *See Barclays*, 734 F.3d at 140-41.  DB executives were well aware of the vulnerability of DB's subprime/nonprime assets: "Gregg Lippmann, the global head of DB's CDO, asset backed securities ('ABS'), and ABS Correlation Trading Desks described the CDO business in 2006 as a 'Ponzi scheme,' and described RMBS as 'pigs,' 'horrible,' [and] 'crap.'"  JA459(TCAC¶13).  In *Lehman*, the district court found that knowledge on the part of "at least one responsible official" was sufficient to demonstrate Lehman's knowledge, *see* 799 F. Supp. 2d at 291, without any showing that the employee was as highly placed as Lippmann.

The most persuasive evidence, however, of DB's awareness of the "vulnerability" of its assets is the fact that, at Lippmann's urging, DB's Executive Committee authorized him to amass and maintain a $5 billion short position against the mortgage-backed security market by late February or early March 2007, *before* the

- 58 -

first of the five offerings at issue here.  JA460, JA514-JA515(TCAC¶¶15, 165-166).

In an Exchange Act case involving DB, the district court found these facts to be

compelling evidence of DB's knowledge of the poor quality of its RMBS and CDOs.

*See IBEW Local 90 Pension Fund v. Deutsche Bank AG*, No. 11 Civ. 4209 (KBF),

2013 U.S. Dist. LEXIS 43774, at *39 (S.D.N.Y. Mar. 27, 2013) ("This short position

only made sense – and only made money – as the value of the RMBS and CDOs

declined").  Moreover, DB acknowledged that it lost about $4.5 billion on those

mortgage-related holdings for 2007, a figure not disclosed in its Offering Materials.

JA460, JA514-JA515(TCAC¶¶15, 165-166).

Defendants were also aware that loan originators were not adhering to

underwriting guidelines, JA460-JA462, JA517-JA518(TCAC¶¶16-18, 168-170),

which exacerbated the vulnerability of their mortgage-backed securities to adverse

market forces and the risk of default of the underlying loans.  JA476-JA480, JA496-

JA498, JA504(TCAC¶¶80, 119, 135).   Indeed, in July 2006, DB acquired

MortgageIT, an originator that repeatedly failed to adhere to standards.

JA519(TCAC¶¶172-174).  DB knew that MortgageIT was issuing and had issued

billions of dollars of mortgage loans that did not comply with stated lending practices,

misrepresented the borrowers' ability to repay and were likely to default.

JA519(TCAC¶172).  The Court in *IBEW* found that such knowledge, combined with

- 59 -

DB's representations of rigorous risk-management, JA473-JA474, JA495-JA496, JA498-JA500(TCAC¶¶75-76, 117, 124-126), satisfied *Fait*'s requirement "of both objective and subjective falsity." *IBEW*, 2013 U.S. Dist. LEXIS 43774, at *40-*41.

Defendants were also aware of the dramatic decline of the ABX/TABX indices, JA485-JA486, JA490-JA491(TCAC¶¶88, 99-101), which this Court found significant in *Barclays*. *See* 734 F.3d at 140-41 n.4. Plaintiffs have thus pleaded abundant evidence demonstrating "that prior to the . . . Offering, defendants were aware of [DB]'s vulnerability to the adverse events in the mortgage and credit market yet failed to take adequate writedowns." *See id.* at 140-41. The showing here thus exceeds that in *Barclays*, and the district court therefore erred in refusing to allow plaintiffs to file the TCAC. *See id.*

### 4.    The Item 503 and Item 303 Claims

While the CAC alleged that defendants violated a disclosure duty under Item 503, *see supra* at 35-42, the TCAC alleges disclosure obligations under both Items 503 and 303.[9] With respect to Item 503, it turns on whether there is a "risk factor" that "could adversely [a]ffect the registrant's present or future business expectations." *See Silverstrand*, 707 F.3d at 103. Plaintiffs have already explained that the CAC

---

[9]    JA476-JA483, JA496-JA498)(TCAC¶¶80-82, 119). TCAC¶81 contains a typographical error, citing Item 303 rather than Item 503, but it provides Item 503's citation, 17 CFR §229.503, and quotes from it.

"allege[d] sufficient facts to infer that [DB] knew, as of the time of [the 2007 and February 2008] offering[s], that (1) a risk factor existed; [and] (2) [it] could adversely [a]ffect [DB]'s present or future business expectations," *see id.*, namely DB's €20 billion exposure to a collapsing real estate market. *See supra* at 35-42. The facts that the TCAC alleges DB knew before even the first offering – the collapse of the subprime/nonprime market, its $5 billion short position against that market, and the failure of originators to adhere to underwriting standards – confirm that "(1) a risk factor existed; [and] (2) [it] could adversely [a]ffect the registrant's present or future business expectations." *See Silverstrand*, 707 F.3d at 103. The TCAC thus makes it even more clear that defendants violated Item 503 in failing to disclose DB's exposure. JA476-JA481, JA496-JA498(TCAC¶¶80-81, 119).

The TCAC added Item 303 claims which "do[] no more than state an alternative theory of recovery." *See Foman*, 371 U.S. at 182. Under Item 303, "a registrant must '[d]escribe any known trends or uncertainties . . . that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations.'" *Litwin*, 634 F.3d at 716 (quoting 17 CFR §229.303(a)(3)(ii)). The description must "focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." *Id.* (quotation

- 61 -

omitted).  It thus "imposes a disclosure duty where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations."  *Id.* (quotation omitted); *accord Panther Partners*, 681 F.3d at 120.

In *Litwin*, plaintiffs "adequately pleaded a presently existing trend, event, or uncertainty" as to the company's real estate investments by "alleg[ing] that the downward trend in the real estate market was already known and existing at the time of the IPO, and that the trend or uncertainty in the market was reasonably likely to have a material impact on Blackstone's financial condition."  634 F.3d at 716. Plaintiffs have plainly done that here.  The TCAC contains extensive allegations demonstrating a "downward trend in the real estate market," including all of the facts that are cited as supporting a disclosure requirement under Item 503.  *See supra* at 35-42.  Indeed, the district court found that "[t]he CAC alleges specific facts about the Company's subprime holdings *and trends in the subprime market that put those holdings at risk*."  SPA18-SPA19(CD59:18-19) (emphasis added).  Such trends must be disclosed under Item 303.  *See Litwin*, 634 F.3d at 716.

The TCAC makes it even more clear that management was aware of the adverse trend before the first offering: one of DB's executives demeaned CDO and RMBS assets, JA455-JA456, JA459(TCAC¶¶3, 13), and urged DB to amass a $5 billion short

- 62 -

position against mortgage-backed securities.  JA455-JA456, JA459(TCAC¶¶3, 14).
DB's upper management approved that short position, JA460(TCAC¶15), which
"only made sense – and only made money – as the value of the RMBS and CDOs
declined."  *IBEW*, 2013 U.S. Dist. LEXIS 43774, at *39.

Defendants were required to disclose "'material events and uncertainties known
to management that would cause reported financial information not to be necessarily
indicative of future operating results or of future financial condition,'" *Litwin*, 634
F.3d at 716, yet defendants did not disclose that the subprime/nonprime market trends
were so unfavorable that it built up that massive hedge position and otherwise sought
to unload its own RMBS and CDO positions.  JA458-JA469(TCAC¶¶11, 14).  It
similarly failed to disclose the underwriting deficiencies that suggested that its assets
were likely worth far less than represented, JA461(TCAC¶17), while at the same time
emphasizing its rigorous risk management.  JA473-JA474, JA495-JA496, JA498-
JA500(TCAC¶¶75-76, 117, 124-126).  Nor did defendants contend below that DB's
enormous  subprime/nonprime  exposure  was  somehow  not  material.
SPA19(CD59:19).  Defendants thus violated Item 303's disclosure duty as to the 2007
offerings as well as the February 2008 offering.  JA478, JA481, JA497(TCAC¶¶80(e),
82, 119(d)).

### 5.    The GAAP/IFRS Disclosure Claims

The TCAC reasserts plaintiffs' claims that defendants were obligated to disclose DB's €20 billion exposure to high-risk subprime and nonprime mortgage-backed securities, and the associated credit risks, under GAAP and IFRS.  JA455-JA457,  JA476-JA480,  JA484-JA488,  JA490-JA491,  JA496-JA497,  JA508-JA511(TCAC¶¶3, 7, 80, 85-89, 93, 96, 100, 119, 148-158).  As set forth previously, the GAAP/IFRS duties to disclose were violated based solely on the facts set forth in the CAC.  *See supra* at 44-45.  The TCAC, however, makes it abundantly clear that defendants were aware of the grievous risks posed by DB's exposure to €20 billion in subprime/nonprime assets.  Prior to the offerings, defendants "knew the value of [DB's] subprime/nonprime-related assets had already collapsed and the market was continuing to deteriorate."  JA476(TCAC¶80(a)).  As a consequence, GAAP and IFRS required disclosure of DB's exposure.  JA476, JA496(TCAC¶¶80(a), 119(a)).  Indeed, DB's Executive Committee had approved Lippmann's $4-5 billion short position by late February or early March 2007, JA460, JA514-JA515(TCAC¶¶15, 165-166), before DB filed its 2006 20-F on March 27, 2007.  JA472(TCAC¶68).  The 20-F neither disclosed DB's €20 billion exposure as a concentration of risk, *see* SFAS No. 107, nor did it disclose that losses on those holdings were at least "reasonably possible" under SFAS No. 5, *see Bridgestone*, 399 F.3d at 677-78.  The claim that the

- 64 -

2006 20-F complied with GAAP is thus plainly false.   JA475, JA479, JA497(TCAC¶¶78, 80(f), 119(e)).

In short, both SFAS 107 and 5, as well as IFRS 7, impose requirements of risk disclosure.   *See supra* at 42-49.   Whether those disclosure criteria are met by concentrations of risk or the reasonable possibility that loss has occurred, the allegations of the TCAC establish that defendants were aware of the serious risk posed by DB's subprime/nonprime assets – thus the $5 billion short position – and that losses had already occurred.  JA458-JA462(TCAC¶¶10-20).  Thus, no matter which provision applies, the allegations of the TCAC demonstrate that DB had a duty to disclose its €20 billion mortgage-backed exposure, and it failed to do so.

### 6.    The VaR Claim

The district court initially denied, but reconsidered, defendants' motion to dismiss plaintiffs' claims asserting that DB's VaR calculations were misleading. SPA23(CD59:23); SPA35(CD70:5).  It reasoned that because plaintiffs alleged that the VaR "metrics were 'false' and that 'they failed to reflect the actual risk associated with the Company's equities trading,'" SPA35(CD70:5) (quoting JA72(CAC¶149)), the claim required "alleg[ations] that Defendants did not honestly believe those valuations when made." SPA35(CD70:5).  The TCAC addresses that ruling, alleging that the VaR metrics are "knowingly false."  JA501(TCAC¶129).

- 65 -

## VI.    CONCLUSION

The district court's dismissal of the claims arising from the 2007 and 2008

offerings and its futility ruling should be reversed.

DATED:  December 10, 2013          Respectfully submitted,

                                   ROBBINS GELLER RUDMAN
                                     & DOWD LLP
                                   ANDREW J. BROWN
                                   STEVEN F. HUBACHEK
                                   ERIC I. NIEHAUS
                                   LUCAS F. OLTS
                                   CHRISTOPHER D. STEWART


                                        s/ STEVEN F. HUBACHEK
                                   _____
                                        STEVEN F. HUBACHEK

                                   655 West Broadway, Suite 1900
                                   San Diego, CA  92101
                                   Telephone:  619/231-1058

                                   LAW OFFICES BERNARD M.
                                     GROSS, P.C.
                                   DEBORAH R. GROSS
                                   Wanamaker Bldg., Suite 450
                                   100 Penn Square East
                                   Philadelphia, PA  19107
                                   Telephone:  215/561-3600

                                   Counsel for Plaintiffs-Appellants

# CERTIFICATE OF COMPLIANCE

The undersigned counsel certified that Plaintiffs-Appellants' Opening Brief And Appendix uses a proportionally spaced Times New Roman typeface, 14-point, and that the text of the brief comprises 13,991 words according to the word count provided by Microsoft Word 2010 word processing software.

s/ STEVEN F. HUBACHEK

STEVEN F. HUBACHEK

# INDEX TO
# PLAINTIFFS-APPELLANTS' SPECIAL APPENDIX

<u>DOCUMENT DESCRIPTION</u>                                    <u>PAGES</u>

Memorandum Decision and Order
(Docket No. 59).………………………………………............SPA1-SPA30

Memorandum Decision and Order
(Docket No. 70).………………………………………..........SPA31-SPA36

Judgment (Docket No. 71)………………………….................SPA37-SPA42

Memorandum Decision and Order
(Docket No. 78)……………….……………………………..SPA43-SPA49

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FIL: 8/19/11

--------------------------------X

In re DEUTSCHE BANK AG          :
SECURITIES LITIGATION           :
--------------------------------X          09 Civ. 1714 (DAB)
                                :
This Document Relates To:       :          MEMORANDUM & ORDER
                                :
ALL ACTIONS                     :
                                :
--------------------------------X

DEBORAH A. BATTS, United States District Judge.

On August 11, 2009, this Court issued an Order consolidating

six putative class action cases filed between February and May

2009 against Deutsche Bank AG ("Deutsche Bank" or the "Company")

and other related entities and individuals.  On November 23,

2009, this Court appointed Co-Lead Plaintiffs and Co-Lead Counsel

and directed the filing of a Consolidated Complaint.  The

Consolidated Amended Complaint (the "CAC") in this case alleges

violations of Sections 11, 12(a)(2), and 15 of the Securities Act

by certain Deutsche Bank[1] and Individual Defendants[2],

---

[1]The Deutsche Bank Defendants are: Deutsche Bank AG,
Deutsche Bank Capital Funding Trust VIII, Deutsche Bank Capital
Funding LLC VIII, Deutsche Bank Capital Funding Trust IX,
Deutsche Bank Capital Funding LLC IX, Deutsche Bank Capital
Funding Trust X, Deutsche Bank Capital Funding LLC X, Deutsche
Bank Contingent Capital Trust II, Deutsche Bank Contingent
Capital LLC II, Deutsche Bank Contingent Capital Trust III,
Deutsche Bank Contingent Capital LLC III, Deutsche Bank
Contingent Capital Trust V, Deutsche Bank Contingent Capital LLC
V and Deutsche Bank Securities Inc.

[2]The Individual Defendants are: Josef Ackerman, Hugo
Banziger, Detlef Bindert, Jonathan Blake, Anthony Di Iorio,
Martin Edelmann, Tessen von Heydebreck, Hermann-Josef Lamberti,

SPA1

Underwriters[3], and auditor KPMG International, relating to a Form
F-3 Registration Statement and Prospectus filed with the
Securities and Exchange Commission ("SEC") on October 10, 2006
(the "Registration Statement"), and various prospectus
supplements to that Registration Statement.  (CAC ¶¶ 1-2.)  Now
before the Court are Motions to Dismiss filed by the Deutsche
Bank Defendants, certain Individual Defendants, and the
Underwriter Defendants.  Also before this Court is Plaintiffs'
Motion to Strike certain documents filed in support of the
Deutsche Bank and Individual Defendants' Motion to Dismiss.  For
the reasons stated herein, the Motions to Dismiss are GRANTED in
part and DENIED in part, and the Motion to Strike is GRANTED.

## I.   BACKGROUND

The following facts from the CAC are assumed to be true for
purposes of this Motion to Dismiss.

On or about October 10, 2006, Deutsche Bank AG filed a Form
F-3 Registration Statement and Prospectus with the SEC utilizing

---

Rainer Rauleder, Peter Sturzinger and Marco Zimmermann.

[3]The Underwriter Defendants are Deutsche Bank Securities
Inc. ("Deutsche Bank Securities"), UBS Securities LLC ("UBS"),
Citigroup Global Markets Inc. ("Citigroup"), Merrill Lynch,
Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), Wachovia
Capital Markets, LLC ("Wachovia"), Morgan Stanley & Co. ("Morgan
Stanley"), and Banc of America Securities LLC ("Banc of
America").

2

a "shelf" registration process which allowed the Company to sell, from time to time, any combination of securities described in the Prospectus.  (CAC ¶ 2.)  Between October 2006 and May 2008, the Company conducted six offerings of preferred securities, and filed a Prospectus Supplement to the Registration Statement each time.  (Id.)

The offerings raised over $6.2 billion of Tier I capital via the sale of 248 million shares of the preferred securities at a price of $25.00 per share as follows: (1) an October 13, 2006 offering of 6.375% Noncumulative Trust Preferred Securities of Deutsche Bank Capital Funding Trust VIII (the "October 2006 Offering"); (2) a May 16, 2007 offering of 6.55% Trust Preferred Securities of Deutsche Bank Contingent Capital Trust II (the "May 2007 Offering"); (3) a July 16, 2007 offering of 6.625% Noncumulative Trust Preferred Securities of Deutsche Bank Capital Funding Trust IX (the "July 2007 Offering"); (4) a November 6, 2007 offering of 7.35% Noncumulative Trust Preferred Securities of Deutsche Bank Capital Funding Trust X (the "November 2007 Offering"); (5) a February 14, 2008 offering of 7.60% Trust Preferred Securities of Deutsche Bank Contingent Capital Trust III (the "February 2008 Offering"); and (6) a May 5, 2008 offering of 8.05% Trust Preferred Securities of Deutsche Bank Contingent Capital Trust V (the "May 2008 Offering").  (CAC ¶ 2.)

3

SPA3

Between 2005 and 2007, Deutsche Bank significantly increased its involvement in structuring, trading and investing in residential mortgage-backed securities ("RMBSs") and collateralized debt obligations ("CDOs") backed by U.S. residential subprime and nonprime mortgages. (CAC ¶ 4.) Subprime and nonprime RMBSs are backed by residential mortgages extended to borrowers who do not qualify for standard loans, and are more risky than RMBSs backed by conforming loans. (CAC ¶ 5.) Default rates began to rise dramatically through 2006 and accelerated in 2007, leading to a decline in the value of the securities backed by subprime and nonprime mortgages. (CAC ¶ 6.)

On January 14, 2009, Deutsche Bank was forced to announce that it anticipated a loss after taxes of €4.8 billion for the fiscal 2008 fourth quarter, driven by negative revenues of €4.8 billion in its sales and trading businesses. (CAC ¶ 10.) On February 5, 2009, the Company announced a net loss of €3.9 billion for fiscal year 2008. (Id.) The deterioration of the Company's mortgage-related assets contributed to the 2008 losses. (Id.) For the full fiscal year, the Company recorded €5.3 billion in write-downs on debt securities and other mortgage-related products, including leveraged loans and loan commitments, RMBSs/CDOs, monoline insurers, and commercial real estate. (Id.)

Each of the Securities purchased in the offerings at issue

4

was purchased at $25.00 per share. (CAC ¶ 11.) By February 24,

2009, the date that the initial lawsuit in this litigation was

commenced, the value of the 6.375% Securities was $8.10 per

share, the 6.55% Securities was $8.35 per share, the 6.625%

Securities was $7.98 per share, the 7.35% Securities was $8.35

per share, the 7.60% Securities was $8.99 per share, and the

8.05% Securities was $11.20 per share. (CAC ¶ 11.)


## II. DISCUSSION

A. Legal Standard for a Motion to Dismiss

For a complaint to survive dismissal under Rule 12(b)(6),

the plaintiff must plead "enough facts to state a claim to relief

that is plausible on its face." Bell Atl. Corp. v. Twombly, 550

U.S. 544, 570 (2007). "A claim has facial plausibility," the

Supreme Court has explained,

> "when the plaintiff pleads factual content that allows
> the court to draw the reasonable inference that the
> defendant is liable for the misconduct alleged. The
> plausibility standard is not akin to a 'probability
> requirement,' but it asks for more than a sheer
> possibility that a defendant has acted unlawfully. Where
> a complaint pleads facts that are 'merely consistent
> with' a defendant's liability, it 'stops short of the
> line between possibility and plausibility of 'entitlement
> to relief.'"

Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting Twombly,

550 U.S. at 556-57). "[A] plaintiff's obligation to provide the

grounds of his entitlement to relief requires more than labels

5

and conclusions, and a formulaic recitation of the elements of a

cause of action will not do." Twombly, 550 U.S. at 555 (internal

quotation marks omitted). "In keeping with these principles,"

the Supreme Court has stated,

> "a court considering a motion to dismiss can choose to
> begin by identifying pleadings that, because they are no
> more than conclusions, are not entitled to the assumption
> of truth.  While legal conclusions can provide the
> framework of a complaint, they must be supported by
> factual allegations. When there are well-pleaded factual
> allegations, a court should assume their veracity and
> then determine whether they plausibly give rise to an
> entitlement to relief."

Iqbal, 129 S.Ct. at 1950.

In ruling on a 12(b)(6) motion, a court may consider the

complaint as well as "any written instrument attached to the

complaint as an exhibit or any statements or documents

incorporated in it by reference." Zdenek Marek v. Old Navy

(Apparel) Inc., 348 F.Supp.2d 275, 279 (S.D.N.Y. 2004) (citing

Yak v. Bank Brussels Lambert, 252 F.3d 127, 130 (2d Cir. 2001)

(internal quotations omitted)).


B.  Section 11 Claims

To state a claim under Section 11 of the Securities Act, a

plaintiff must allege that: (1) it purchased a registered

security; (2) the defendant participated in the offering in a

manner giving rise to liability under Section 11; and (3) the

registration statement "contained an untrue statement of a
material fact required to be stated therein or necessary to make
the statements therein not misleading." 15 U.S.C. § 77k(a). A
claim under Section 11 may be asserted against every person who
signed the registration statement, the directors of the issuer
and the underwriter of the securities, among others. Id.

A court finds a violation of Section 11 when "material facts
have been omitted or presented in such a way as to obscure or
distort their significance." In re Flag Telecom Holdings, Ltd.
Sec. Litig., 618 F.Supp.2d 311, 320-21 (S.D.N.Y. 2009). "The
test for determining whether the prospectus contained a material
misstatement or omission is whether the defendants'
representations in the prospectus, taken together and in context,
would have misled a reasonable investor." Id. Moreover, "[i]n
the area of pure omissions, disclosure of the information must be
required." Litwin v. The Blackstone Group L.P., 634 F.3d 706,
722 (2d Cir. 2011) ("Here, plaintiffs adequately plead that Item
303 of Regulation S-K requires Blackstone to disclose the omitted
information, but without that regulatory requirement Blackstone
would be under no obligation to disclose even material
information."); see also Resnik v. Swartz, 303 F.3d 147, 154 (2d
Cir. 2002) ("Disclosure of an item of information is not required
. . . simply because it may be relevant or of interest to a

7

SPA7

reasonable investor.  For an omission to be actionable, the
securities laws must impose a duty to disclose the omitted
information."); In re Morgan Stanley Tech. Fund Sec. Litig., 643
F.Supp.2d 366, 375 (S.D.N.Y. 2009) ("[I]t is well established
that there is no liability in the absence of a duty to disclose,
even if the information would have been material.")

A duty to disclose may be imposed by statute or regulation,
or may arise when information is needed to make another statement
not misleading.  Morgan Stanley, 643 F.Supp.2d at 375.


(1) The October 2006 Offering

The October Registration Statement and October 13, 2006
Prospectus Supplement incorporated by reference Deutsche Bank's
Form 20-F for the year ending December 31, 2005 (the "2005 20-
F"), which stated that the Company utilized "a detailed risk
assessment of every credit exposure."  (CAC, ¶ 63.)  The 2005 20-
F also included a statement from the Company's auditor KPMG that
the Company's consolidated financial statements "present fairly,
in all material respects, the financial position of [the Company]
. . . in conformity with U.S. generally accepted accounting
principles."  (CAC, ¶ 66.)

Plaintiffs allege that these statements were materially
false and misleading when made because: (a) the Company failed to

8

disclose that it had significant exposure to the high-risk
subprime and nonprime residential mortgage market through RMBS
and CDO-related assets; (b) the Company failed to disclose its
true exposure to RMBS/CDO securities and other mortgage-related
assets; and (c) the Company failed to disclose a material
concentration of risk arising from subprime/nonprime-backed CDOs
in its 2005 20-F as required by GAAP.  (CAC, ¶ 67-68.)

        Plaintiffs first allege that the Company failed to disclose
a material concentration of risk arising from subprime/nonprime-
backed CDOs and non-prime mortgage-related assets.  (CAC, ¶ 68.)
Plaintiffs claim that Paragraph 15A of FASB Statement of
Financial Accounting Standards ("SFAS") No. 107, Disclosures
about Fair Value of Financial Instruments, required the Company
to disclose "all significant concentrations of credit risk from
all financial instruments, whether from an individual
counterparty or groups of counterparties."  (Id.)  According to
Plaintiffs, Deutsche Bank's exposure to the subprime and nomprime
market was a concentration of credit risk that should have been
disclosed under SFAS No. 107 and, accordingly, that the failure
to disclose means that the Company's financial statements did not
comply with GAAP.  Similarly, the CAC alleges that the Company's
exposure to subprime and nonprime mortgage-backed assets at the
time of the October 2006 Offering constituted a "significant

SPA9

factor[ ] that ma[de] the offering speculative or risky," such that disclosure was required pursuant to Item 503 of Regulation S-K, 17 C.F.R. §229.503. (See CAC ¶ 73.)

Plaintiffs' allegation that Deutsche Bank's subprime and nonprime exposure represented a group concentration of credit risk, (see CAC, ¶ 69), is a legal conclusion, rather than a factual one. See Employees' Retirement System of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co., ___ F.Supp.2d ___, 2011 WL 1796426 (S.D.N.Y. May 10, 2011) ("A bare assertion that appraisals were not made in accordance with USPAP is 'a legal conclusion not entitled to the assumption of truth unless supported by appropriate factual allegations.'") (quoting Tsereteli v. Residential Asset Securitization Trust 2006-A8, 692 F.Supp.2d 387, 393 (S.D.N.Y. 2010). Plaintiffs, however, allege no facts contemporaneous to the October 2006 Offering that would support the conclusion that the Company's subprime/nonprime holdings represented a group concentration of credit risk at the time of that offering, nor do Plaintiffs allege any contemporaneous facts about Deutsche Bank's subprime/nonprime holdings that would support the conclusion that they constituted a significant factor that made the offering speculative or risky.

The CAC alleges that the Company's mortgage-backed assets amounted to "as much as €20 billion," (CAC, ¶ 75), but also that

10

SPA10

the Company acquired billions of dollars in exposure to subprime
and nonprime mortgage-backed assets "[b]etween 2005 and 2007."
The CAC is devoid of factual allegations as to the Company's
exposure to subprime and nonprime mortgage-backed assets as of
the date of the October 2006 Offering.

Likewise, the CAC does not allege adequately that disclosure
of the Company's specific subprime/nonprime exposure was required
to make another statement not misleading.  The CAC alleges that
"[b]y failing to allege any information about the level and
structure of its subprime/nonprime asset holdings . . . the
Offering Materials prevented investors from determining the
effect that the subprime and nonprime mortgage crisis was having
on the Company prior to the Offering(s), i.e., its exposure to
the subprime crisis."  (CAC ¶ 74.)  The CAC continues,
"Accordingly, investors were unable to consider the impact on
[Deutsche Bank] of the adverse events in the subprime and
nonprime markets because [D]efendants effectively represented
that the Company had no exposure."  (Id.)

The CAC, however, ignores the Company's 2005 20-F, which is
incorporated into the October 2006 Offering.  In that document,
the Company states, "We aim to expand our presence in the U.S.
market by growth in key businesses, such as equity derivatives
and mortgage-backed securities."  (Bateup Decl., Ex. A, at 17.)

11

The Company, therefore, disclosed its intention to expand its activities in mortgage-backed securities.  Furthermore, the 2005 20-F disclosed that "[i]n recent years, we have increased our exposure to the financial markets as we have emphasized growth in our investment banking activities, including trading activities. Accordingly, we believe that we are more at risk from adverse developments in the financial markets than we were when we derived a larger percentage of our revenues from traditional lending activities."  (Id., at 7.)

The Company disclosed that it intended to increase its activities in mortgage-backed securities, and disclosed that its increased trading activities could lead to losses.  The CAC alleges no facts contemporaneous to the 2006 Offering that would have required the Company to disclose its specific exposure to subprime/nonprime mortgage-backed securities, in order to make the Company's general statements about exposure to the mortgage-backed securities market not misleading.  Accordingly, the CAC fails to state a claim as to the October 2006 Offering.

(2) The 2007 Offerings

a.  Timeliness

Defendants first argue that Plaintiffs lack standing to assert claims related to the May 2007 Offering.  Plumbers' Union is the only named Plaintiff alleged to have acquired securities

12

SPA12

"pursuant or traceable to" to the May 2007 Offering.  (CAC ¶ 19.)
Plumbers' Union, however, first asserted its claims in the CAC,
which was filed on January 25, 2010, more than one year after
January 14, 2009, when Plaintiffs were on notice of their claims.
(See CAC ¶ 172.)

     Of the six actions originally filed in this case, only
Gerson v. Deutsche Bank AG, 09 Civ. 3884, mentioned the 6.55%
Trust Securities issued in the May 2007 Offering.  As evident
from the Certification filed with the Complaint in that case,
however, the named Plaintiff in the Gerson case did not purchase
the 6.55% Securities.  Accordingly, the Plaintiff in the Gerson
suit lacked standing to sue for violations relating to the May
2007 Offering.  See In re Am. Int'l Group Inc. Sec. Litig., 265
F.R.D. 157, 165 (S.D.N.Y. 2010).

     Plaintiffs contend that they are entitled to the benefit of
the rule set forth in American Pipe & Constr. Co. v. Utah, 414
U.S. 538 (1974), which held that "commencement of a class action
suspends the applicable statute of limitations as to all asserted
members of the class who would have been parties had the suit
been permitted to continue as a class action."  American Pipe,
414 U.S. 554.  In that case, intervening plaintiffs' claims that
would have otherwise been untimely were allowed to proceed
following a court's determination that a class action could not

13

be sustained.  Id.  The Supreme Court noted that requiring

purported class members to anticipate successfully a court's

determination of the viability of a class action would result in

unnecessary and duplicative motions.  Id.

Courts in this District have held in following the American

Pipe rule in cases resembling this one, that the statute of

limitations may be tolled by the filing of a class action

complaint purporting to include a certain security, even if it is

later determined that the named plaintiff lacked standing to sue

for violations relating to that security.  See In re IndyMac

Mortgage-Backed Sec. Litig., __ F.Supp.2d __, No. 09 Civ. 4583

(LAK), 2011 WL 2508254, at *5 (S.D.N.Y. June 21, 2011) (finding

that an earlier-filed complaint tolled the statute of limitations

even where plaintiffs lacked standing and noting that a contrary

decision would undermine the efficiency of class actions); In re

Flag Telecom Holdings, Ltd. Sec. Litig., 352 F.Supp.2d 429, 455-

56 (S.D.N.Y. 2005) (same), abrogated on other grounds, 574 F.3d

29 (2d Cir. 2009); In re Initial Public Offering Sec. Litig., No.

21 MC 92 (SAS), 2004 WL 3015304, at *5 (S.D.N.Y. Dec. 27, 2004)

(tolling statute of limitations where absent class members would

not have been aware that original plaintiff lacked standing to

assert claims on their behalf).

Defendants argue that those cases are distinguishable

14

because it was evident from the face of the Certification filed in the Gerson action that the Plaintiff in that action never purchased the securities at issue and therefore lacked standing. (UW Defs.' Mem. L. at 12, n.6) This Court does not find this difference persuasive. After all, in the Am. Int'l Group decision, which was issued after the Gerson Complaint was filed, this Court noted that "[t]here is conflicting case law in the Second Circuit on whether a court may certify a class of purchasers of a security or fund that was not also purchased by the Lead Plaintiffs." 265 F.R.D. at 165. Therefore, at the time the Gerson Complaint was filed, it may not have been evident to silent class members that the Gerson Complaint was defective. Accordingly, this Court finds that the statute of limitations was tolled by the filing of the Gerson Complaint, and claims relating to the May 2007 Offering are timely.

### b. Misstatements and Omissions

The Company filed Prospectus Supplements in connection with the May 2007 Offering, the July 2007 Offering, and the November 2007 Offering. (CAC ¶¶ 76, 79, 82.) The Company's 2006 20-F was incorporated into the three 2007 Offerings. (CAC ¶ 85.)

With respect to the Company's credit risks, the 2006 20-F stated, inter alia, "[a] primary element of the credit approval process is a detailed risk assessment of every credit exposure

15

SPA15

associated with a counterparty." (CAC ¶ 85.)  With respect to
the Company's market risks, the 2006 20-F stated, "We use a
combination of risk sensitivities, value-at-risk, stress testing
and economic capital metrics to manage market risks and establish
limits." (CAC ¶ 86.)  Regarding proprietary trading, the 2006
20-F stated, "[w]ithin Corporate Banking & Securities, we conduct
proprietary trading, or trading on our own account, in addition
to providing products and services to customers.  Most trading
activity is undertaken in the normal course of facilitating
client business." (CAC ¶ 87.)  The Company continued, "[w]hile
we have taken selective trading opportunities and risks
throughout the year, our value-at-risk for the trading units
remained within a band between €58.3 million and €82.0 million."
(Id.) The 2006 20-F also included a statement from KPMG that the
consolidated financial statements were presented in conformity
with U.S. GAAP.  (CAC ¶ 88.)

The November 2007 Offering also incorporated by reference a
Form 6-K filed on November 1, 2007, which stated that the Company
had taken charges of €1.6 billion "on trading activities in
relative value trading in both debt and equity, CDO correlation
trading and residential mortgage-backed securities.  (CAC ¶ 89.)
The Form 6-K noted that "[p]erformance suffered primarily from
the rapid loss of liquidity in credit markets from August

16

SPA16

onwards. . . . ," which "negatively impacted credit trading positions in relative value trading, CDO correlation trading and residential mortgage-backed securities."  (Id.)

The CAC claims that these statements were false and misleading because (a) the Company failed to disclose its more than €20 billion exposure to the high-risk subprime and nonprime residential mortgage markets; (b) the disclosures about market risk and credit risk misrepresented the Company's true exposure to RMBS/CDO securities; and (c) the 2006 20-F did not comply with GAAP.  (CAC ¶ 90.)

The CAC first alleges that the Company's exposure to the subprime and nonprime residential mortgage markets represented a concentration of credit risk that gave rise to a reporting obligation under GAAP and, therefore, a duty to disclose.  (CAC ¶ 90.)  The CAC alleges that in 2007 the Company had €3.46 billion of gross exposure to CDOs backed primarily by subprime/nonprime mortgages.  (CAC ¶ 97.)  The CAC also alleged that the Company had €9 billion in net counterparty exposure to monoline insurers, and that the exposure was tied to the monoline insurers' ability to absorb the losses on the billions of dollars of subprime/nonprime assets they insured.  (CAC ¶¶ 99-100.)  The Company had an additional €9.7 billion of RMBS backed primarily by subprime and nonprime mortgages.  (CAC ¶ 102.)  Furthermore,

17

SPA17

the CAC alleges that indicators of market conditions prior to the
2007 Offerings, such as the number of properties in foreclosure,
and the default and delinquency rates for subprime loans,
demonstrated that the Company's subprime/nonprime loans
represented a concentration of credit risk.  (CAC ¶ 105.)

Next, the CAC alleges that in violation of SFAS No. 107, the
Company valued its subprime and mortgage-backed assets based on
subjective internal estimates that were clearly inconsistent with
current market conditions.[4]  (CAC ¶ 94).  The CAC alleges that
the ABX Index for RMBS tranches rated BBB and BBB- had suffered
serious declines by February and March 2007, with some tranches
dropping as much as 60%.  (CAC ¶ 110.)  The TABX Index, which
tracked the value of BBB and BBB- tranches of the ABX indices,
but also took into account varying levels of subordination, also
plunged between February 2007 and September 2007.  (CAC ¶¶ 107,
112.)  Nonetheless, the Company did not write down the value of
its RMBS/CDO holdings until October 2007, when it took a €1.6
billion charge related to "CDO correlation trading and
residential mortgage-backed securities."  (CAC ¶ 113-114.)

Defendants contend they had no duty to "disaggregate" or
quantify the particular types or quality of the Company's

_____

[4]Although the CAC alleges that the Company also violated
SFAS No. 157, the CAC itself concedes that SFAS No. 157 did not
take effect until January 1, 2008.  (CAC ¶ 91.)

mortgage-related holdings.  This Court cannot say that no such
duty existed as a matter of law.  See Litwin, 634 F.3d at 721
(finding plausible plaintiffs' claims that defendant had a duty
to disclose particular facts regarding residential real estate
holdings, given market trends affecting that specific sector).
The CAC alleges specific facts about the Company's subprime
holdings and trends in the subprime market that put those
holdings at risk.  See In re Citigroup Inc. Sec. Litig., 753
F.Supp.2d 206, 235 (S.D.N.Y. 2010) (finding that plaintiffs
adequately pled that defendant's subprime holdings constituted a
"concentration of credit risk" that was concealed in violation of
GAAP where plaintiff's alleged deterioration in the subprime
market specifically affecting those holdings).  Defendants make
no attempt to argue that the CAC fails to allege adequately the
materiality of the omitted information.  Accordingly, this Court
finds that the CAC adequately pleads that the Offering Materials
for the 2007 Offerings were materially misleading.

    (3) The February 2008 Offering

    The Company filed a Registration Statement and Prospectus
Supplement with the SEC on or about February 14, 2008.  (CAC ¶
121.)  The February 2008 Prospectus Supplement incorporated by
reference the 2006 20-F.  (CAC ¶ 123.)  The February 2008
Prospectus Supplement also incorporated by reference a Form 6-K

filed by the Company on February 7, 2008. (CAC ¶ 125.) The Form 6-K stated that "we took no further losses on our remaining CDO exposures in the current quarter after taking into account related gains on hedge positions." (Id.) It continued, "[i]n the fourth quarter, we again demonstrated the quality of our risk management. We had no net write-downs related to sub-prime, CDO or RMBS exposures." (Id.) The CAC alleges that these statements were false because the Company failed to account properly for its CDO and RMBS securities at the end of 2007. (CAC ¶ 126.)

The February 2008 6-K also noted the Company's "robust earnings for the fourth quarter, which concludes one of our best years ever and a year of solid performance in challenging times." (CAC ¶ 127.) The CAC alleges that this statement was false and misleading because the Company would not have had "robust earnings" if it had accounted properly for its RMBS/CDO-related exposure. (CAC ¶ 128.) The CAC also alleges that Defendants failed to disclose that the Company engaged in high-risk proprietary trading. (CAC ¶ 129.)

Regarding the Company's proprietary trading, the CAC has failed to allege a misstatement or omission. The CAC asserts that the Company's claims as to the quality of its risk management were misleading, as evidenced by the losses the Company incurred in its proprietary trading activities. The

20

Company, however, specifically warned investors that proprietary trading losses were possible. In its 2006 20-F, the Company stated that "[i]n recent years we have increased our exposure to the financial markets as we have emphasized growth in our investment banking activities, including trading activities. Accordingly, we believe that we are more at risk from adverse developments in the financial markets than we were when we derived a larger percentage of our revenues from traditional lending activities." (Bateup Decl. Ex. B, 2006 20-F at 9.) The Company also disclosed that "our risk management techniques and strategies may not be fully effective in mitigating our risk exposure in all economic market environments or against all types of risk, including risks that we fail to identify or anticipate." (Bateup Decl. Ex. B, 2006 20-F at 12.)

The allegations regarding risk management in the CAC are significantly different from the allegations in <u>Iowa Public Employees' Retirement Sys. v. MF Global Ltd.</u>, 620 F.3d 137 (2d Cir. 2010). In that case, the Second Circuit found that cautionary statements about possible inadequacies in MF Global's risk management procedures did not necessarily absolve MF Global of liability under Section 11 when the complaint alleged that MF Global allowed a broker to take positions vastly in excess of MF Global's trading limits, and that MF Global's internal risk

21

**SPA21**

controls did not apply to brokers trading for their own accounts. Iowa Public, 620 F.3d at 139. The CAC here makes the far more general allegation that the Company's risk management procedures proved to be inadequate to insulate the Company from proprietary trading risk. The CAC alleges no facts that are inconsistent with the Company's disclosure that it was increasing its proprietary trading activities and, correspondingly, that it was exposed to increased risk from proprietary trading.

Regarding the Company's alleged failure to account properly for its mortgage-related holdings and disclose risks related to those holdings, however, the Court finds that the CAC has adequately pled a misstatement or omission, for the same reasons noted in the discussion of the 2007 Offerings, supra.

(4) The May 2008 Offering

On or about May 5, 2008, the Company filed a Prospectus Supplement with the SEC, which incorporated by reference the Annual Report on Form 20-F of Deutsche Bank AG for the year ended December 31, 2007 filed on March 26, 2008 (the "2007 20-F"). (CAC ¶¶ 153-155.) The Prospectus Supplement also incorporated by reference a Form 6-K filed by the Company on April 29, 2008. (CAC ¶ 170.)

The CAC's allegations regarding the inadequacies in the Company's risk management procedures with respect to proprietary

22

SPA22

trading fail for the same reasons discussed with respect to the February 2008 Offering, supra.  The CAC alleges no facts supporting an allegation that the risk management procedures were not applied as the Company stated.  An allegation that in hindsight those procedures were not sufficient to prevent losses is insufficient to state a claim.

The CAC makes two additional allegations with respect to the May 2008 Offering: (1) that the Company's reported Value-at-Risk ("VaR") metrics were false and failed to reflect the actual risk associated with the Company's equities trading; and (2) the Company failed to disclose its exposure to monoline insurers.

Regarding VaR, the 2007 20-F stated that "'Value-at-risk' is the primary metric we use in the management of our trading market risks."  (CAC ¶ 159.)  The 2007 20-F stated that the Company's equities trading VaR ranged between $43.5 million and $90.5 million in 2007.  (CAC ¶ 162.)  Although the Company stated that "trading market risk outside of these units is immaterial," the Company reported equities trading losses for 2008 of $630 million, which is almost 700% above the "maximum exposure" of $90.5 million.  (CAC ¶ 162.)  These factual allegations of trading vastly in excess of stated VaR limits are sufficient to state a claim.  See In re Lehman Bros. Sec. and ERISA Litig., __ F.Supp.2d __, No. 09 MC 2017 (LAK), 2011 WL 3211364, at *17

(S.D.N.Y. July 27, 2011) ("The factual allegations of routine breaches of VaR limits . . . are sufficient to permit a reasonable trier of fact to conclude that the statements in the Offering Materials were materially misleading, particularly in light of the suggestion in Lehman's 2007 10-K that breaches of VaR limits were infrequent.")

The CAC's allegations regarding the Company's exposures to monoline insurers, however, fail to state a claim.  Although the CAC points to the Company's disclosure of only about €2.3 billion in counterparty exposure to monoline insurers, the April 29, 2008 Form 6-K clearly stated that the notional value of the Company's exposure to monoline insurers was approximately €8.9 billion. (Bateup Decl. Ex. I, April 28, 2008 6-K, at 11.)  The Company's true exposure to monoline insurers was disclosed adequately. Accordingly, the CAC's allegation that the Company's financial statements were not prepared in conformity with IFRS regarding exposure to monoline insurers also fails.

C.  Section 12(a)(2) Claims

Plaintiffs assert claims under § 12(a)(2) of the Securities Act, 15 U.S.C. § 77l, against the Company, the Trust and LLC Defendants, and the Underwriter Defendants.

Liability under Section 12(a)(2) arises when a person offers or sells a security by means of a prospectus or oral

24

SPA24

communication that includes a material misrepresentation or
omission. 15 U.S.C. § 771(a)(2). "A plaintiff has standing to
bring a Section 12 claim only against a 'statutory seller' from
which it 'purchased' a security. In re Lehman Bros. Sec. and
ERISA Litig., 2011 WL 3211364, at *35.) "A 'statutory seller' is
one who, in a public offering, either transferred title to the
purchaser or successfully solicited the transfer for financial
gain." Id.

The Deutsche Bank Defendants argue that they cannot be
considered "statutory sellers" because the CAC fails to allege
privity between the Deutsche Bank Defendants and Plaintiffs, or
that the Deutsche Bank Defendants participated actively in the
sales of the securities to Plaintiffs. (DB Defs.' Mem. L. at
45.) Although privity between Plaintiffs and the Deutsche Bank
Defendants is not required, see In re Scottish Re Group Sec.
Litig., 524 F.Supp.2d 370, 399 (S.D.N.Y. 2007), the CAC must
allege (1) that the Company solicited sales of its securities;
and (2) that the Company was motivated by financial gain. See
Id. at 400. Here, the allegations in the CAC that Deutsche Bank
conducted offerings of the securities and raised over $6.2
billion in Tier 1 capital from the sale of the securities (See
CAC ¶ 2), is sufficient to bring Deutsche Bank within the
"statutory seller" definition. See Scottish Re, 524 F.Supp.2d at

25

SPA25

400 (finding allegations sufficient when they alleged that the company conducted a public offering and benefitted from the sale of those securities).

The Underwriter Defendants claim that Plaintiffs lack standing under Section 12(a)(2) because the CAC fails to allege facts sufficient to demonstrate that the securities were purchased in the public offerings at issue, as opposed to in the secondary market. See Gustafson v. Alloyd Co., 513 U.S. 561, 578 (1995); In re Alcatel Sec. Litig., 382 F.Supp.2d 513, 530 n.8 (S.D.N.Y. 2005). The Underwriter Defendants are correct that allegations such as those in the CAC that securities were purchased "pursuant or traceable to" the Registration Statement and Prospectuses (CAC ¶¶ 16-19) are insufficient to establish standing for purposes of Section 12(a)(2). See In re Lehman Bros. Sec. and ERISA Litig., 2011 WL 3211364, at *35 (noting that "[a] complaint that alleges that the plaintiff purchased its securities 'pursuant and/or traceable to' the Offering Documents is not sufficient" to confer standing under Section 12(a)(2)). The Section 12(a)(2) claims must therefore be dismissed.

D. Section 15 Claims

Plaintiffs assert claims under Section 15 of the Securities Act against Deutsche Bank, the Individual Defendants, and KPMG

26

International.[5]

Section 15 creates liability for "[e]very person who, by or through stock ownership, agency, or otherwise, controls any person liable under Sections 77k . . . of this title . . ." 15 U.S.C. § 77o. A "control person" subject to liability under Section 15 must have "the power, directly or indirectly, 'to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" <u>In re Deutsche Telekom AG Sec. Litig.</u>, No. 00 Civ. 9475 (SHS) 2002 WL 244597, at *6 (S.D.N.Y. Feb. 20, 2002) (quoting 17 C.F.R. § 230.405).

As an initial matter, Section 15 claims must be dismissed where a plaintiff fails to plead a primary violation under Section 11 or Section 12. <u>See, e.g.</u>, <u>Morgan Stanley Info. Fund Sec. Litig.</u>, 592 F.3d 347, 358 (2d Cir. 2010); <u>In re Am. Int'l Group, Inc. Sec. Litig.</u>, 265 F.R.D. 157, 167 (S.D.N.Y. 2010). The Section 15 claims relating to the October 2006 Offering are therefore dismissed.

Defendants contend that the remaining Section 15 claims must be dismissed because the CAC fails to allege any "culpable participation" by the purported "control person" Defendants. (DB Defs.' Mem. L. at 47.) As the Second Circuit recently noted, the

_____

[5]KPMG International has not appeared in this action.

27

issue of whether a plaintiff must demonstrate "culpable

participation" by the alleged controlling person "has divided

district courts in this Circuit." In re Lehman Bros. Mortgage-

Backed Sec. Litig., __ F.3d __, 2011 WL 1778726, at *15 (2d Cir.

May 11, 2011).

This Court agrees with those courts that have declined to

impose a requirement that a plaintiff allege "culpable

participation" to state a violation under Section 15. See, e.g.,

In re Refco, Inc. Sec. Litig., 503 F.Supp.2d 611, 660-661 & n.43

(S.D.N.Y. 2007) (finding that the "culpable participation"

requirement applied only to claims under Section 20(a)); In re

CINAR Corp. Sec. Litig., 186 F.Supp.2d 279, 309-10 (E.D.N.Y.

2002) (finding that there is no "culpable participation"

requirement under Section 15 because Section 11, unlike Section

10(b), contains no intent element). It would be incongruous to

require allegations regarding "state of mind," as Defendants

suggest is required, when the Section 11 claims on which the

Section 15 claims are premised contain no "state of mind"

element. The Motions to Dismiss the remaining Section 15 claims

must be denied.


E.  Leave to Replead

    When a complaint has been dismissed, permission to amend it

28

**SPA28**

"shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). However, a court may dismiss without leave to amend when amendment would be "futile," or would not survive a motion to dismiss. <u>Gatt Communications, Inc. v. PMC Associates</u>, 10 Civ. 8, 2011 WL 1044898 at *7 (S.D.N.Y. Mar. 10, 2011) (citing <u>Oneida Indian Nation of NY v. City of Sherrill</u>, 337 F.3d 139, 168 (2d Cir. 2003).

Because Plaintiffs cannot allege any facts contemporaneous to the October 2006 Offering that would have required particularized disclosure of Deutsche Bank's exposure the subprime and nonprime real estate markets, the claims relating to the October 2006 Offering are dismissed without leave to replead.

F. Motion to Strike

Plaintiffs move to strike Exhibits E, H, L, M, N, O, P, Q, and R to the Bateup Declaration as documents not referenced in the CAC, not matters of public record, and not subject to judicial notice. Defendants did not respond to the Motion to Strike, and this Court did not rely on documents outside of the CAC or that were not referenced therein in deciding the Motions to Dismiss. Accordingly, the Motion to Strike is GRANTED.

29

### III.  CONCLUSION

The Motions to Dismiss are GRANTED WITH PREJUDICE with respect to Plaintiffs' Section 11, Section 12(a)(2) and Section 15 claims relating to the October 2006 Offering;

The Motions to Dismiss are GRANTED WITHOUT PREJUDICE with respect to Plaintiffs' remaining claims under Section 12(a)(2);

The Motions to Dismiss are DENIED in all other respects;

Plaintiff's Motion to Strike is GRANTED;

Plaintiff shall file a Second Consolidated Amended Complaint within 30 days of the date of this Order; and

Defendants shall answer within 60 days of the date of this Order.


SO ORDERED.

Dated:    New York, New York
          *August 19, 2011*

                              *Deborah A. Batts*
                          DEBORAH A. BATTS
                    United States District Judge


30

SPA30

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------X
In re DEUTSCHE BANK AG          :
SECURITIES LITIGATION           :
--------------------------------X
                                :
This Document Relates To:       :
                                :
ALL ACTIONS                     :
                                :
--------------------------------X

09 Civ. 1714 (DAB)

MEMORANDUM & ORDER

DEBORAH A. BATTS, United States District Judge.

On August 19, 2011, this Court granted in part and denied in part Defendants' Motions to Dismiss Plaintiffs' Consolidated Amended Complaint ("CAC") in this matter. See In re Deutsche Bank Sec. Litig., No. 09 Civ. 1714 (DAB), 2011 WL 3664407, at *12 (S.D.N.Y. Aug. 19, 2011). Four days later, on August 23, 2011, the Second Circuit issued an opinion in Fait v. Regions Financial Corp., 655 F.3d 105 (2d Cir. 2011), affirming that estimates of goodwill and loan loss reserves were not "facts," but rather "opinions." Fait, 655 F.3d at 110, 113. Accordingly, to state a claim under the Securities Act, plaintiffs must allege not only that the statements were false, but that the defendants' opinions were not honestly believed when made. See id. Arguing that Fait is an intervening change in the governing law, Defendants here move to reconsider this Court's August 19, 2011 decision. For the reasons set forth herein, the Motion to Reconsider is GRANTED. On reconsideration, the Motion to Dismiss is GRANTED and the Complaint is DISMISSED.

A.  Legal Standard for a Motion to Reconsider

The standard for granting a motion to reconsider "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked -- matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." Shrader v. CSC Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995); see also Range Road Music, Inc. v. Music Sales Corp., 90 F. Supp. 2d 390, 392 (S.D.N.Y. 2000) (holding that a motion for reconsideration "is appropriate only where the movant demonstrates that the Court has overlooked controlling decisions or factual matters that were put before it on the underlying motion . . . and which, had they been considered, might have reasonably altered the result before the court."). Reconsideration is also appropriate when there has been a change in controlling law. King County, WA v. IKB Deutche Industriebank AG, __ F. Supp. 2d __, 2012 WL 2160285, at *1 (S.D.N.Y. June 7, 2012). In addition, "The standards governing a motion to alter or amend judgment pursuant to Rule 59(e) and motions for reconsideration or reargument pursuant to Local Rule 6.3 are the same." Word v. Croce, No. 00 Civ. 6496, 2001 WL 755394, at * 2 (S.D.N.Y. July 5, 2001).

Furthermore, a motion for reconsideration is not one in which a party may reargue "those issues already considered when a

2

party does not like the way the original motion was resolved."
In re Houbigant, Inc., 914 F. Supp. 997, 1001 (S.D.N.Y. 1996).
Thus Local Rule 6.3 should be "narrowly construed and strictly
applied" to avoid repetitive arguments already submitted to the
Court.  National Congress for Puerto Rican Rights v. City of New
York, 191 F.R.D. 52, 53 (S.D.N.Y. 1999) (citation omitted).
Moreover, the parties "may not address facts, issues or arguments
not previously presented to the Court," U.S. Titan v. Guangzhou
Zhen Hua Shipping Co., Ltd., 182 F.R.D. 97, 100 (S.D.N.Y. 1998)
(citations omitted), because a motion to reconsider should never
act "as a substitute for appealing from a final judgment."
Bonnie & Co. Fashions, Inc. v. Bankers Trust Co., 170 F.R.D. 111,
113 (S.D.N.Y. 1997) (citation omitted).

B.   The Fait Decision

The Second Circuit's decision in Fait, along with its recent
reiteration of that decision in City of Omaha, NE Civilian Emps.
Ret. Sys. v. CBS Corp., 679 F.3d 64 (2d Cir. 2012), constitutes a
change in intervening law warranting reconsideration of this
Court's August 19, 2011 Order.  In Fait, and later in City of
Omaha, the Second Circuit, for the first time, held that
valuation decisions such as goodwill and statements of loan loss
reserves are "opinions" rather than facts, and will not give rise
to liability unless a plaintiff can "plausibly allege that

3

SPA33

defendants did not believe the statements . . . at the time they made them." <u>Fait</u>, 655 F.3d at 112.  As the Second Circuit made clear in <u>City of Omaha</u>, even statements that Defendants <u>should have known</u> that their valuation decisions were false or misleading will not state a plausible claim for relief under the Securities Act.  After <u>Fait</u>, Plaintiffs must allege that Defendants did not believe their valuation statements at the time they made them.  <u>City of Omaha</u>, 679 F.3d at 68.  It is clear that this was a change in intervening law.  <u>See</u>, <u>In re General Elec. Co. Sec. Litig.</u>, __ F. Supp. 2d __, 2012 WL 1371016, at *5 (S.D.N.Y. Apr. 18, 2012) (granting reconsideration to consider the impact of <u>Fait</u> on a prior decision).

C.  This Court's Order

The August 19, 2011 Order denied Defendants' Motion to Dismiss on Plaintiffs' claims under Sections 11 and 15 of the Securities Act regarding: (1) 2007 and February 2008 Offerings where the Company's internal valuations of subprime and mortgage-backed assets were inconsistent with market indices, where a more accurate valuation may have required the Company to disclose those holdings; and (2) the May 2008 Offering where the Company relied on faulty Value-at-Risk ("VAR") metrics, resulting in trading losses almost 700% above stated VaR limits.

In both instances, Plaintiffs alleged that Defendants'

4

internal valuation systems were faulty.  For valuation of subprime and mortgage-backed assets, Plaintiffs alleged that Defendants "should have known" that the ABX Index "should have been used in valuing RMBS and CDOs."  (CAC ¶ 96.)  Regarding VaR, Plaintiffs alleged that the Company's metrics were "false" and that "they failed to reflect the actual risk" associated with the Company's equities trading.  (Id. ¶ 149.)  These allegations suggest that Defendants were wrong, and perhaps egregiously so, in their internal valuation metrics.  It is clear after Fait, however, that such valuations are matter of opinion rather than fact.  Accordingly, Plaintiffs must allege that Defendants did not honestly believe those valuations when made.  The Complaint in this matter contains no such allegations.

Plaintiffs concede that the claims in the Complaint "exclusively rely on theories of strict liability and negligence."  (CAC ¶ 1.)  Plaintiffs therefore specifically aver that none of their claims are based on knowing misconduct by the Defendants.  This alone is fatal to Plaintiffs' claims after Fait.  See In re General Elec. Sec. Litig., 2012 WL 1371016, at *9 (finding statement that allegations are not based on "knowing misconduct" equivalent to a concession that statements of opinion were not disbelieved when made).

5

D.   Leave to Replead

When a complaint has been dismissed, permission to amend it "shall be freely given when justice so requires."  Fed. R. Civ. P. 15(a).   Nevertheless, a court may dismiss without leave to replead when amendment would be "futile," or would not survived a motion to dismiss.   <u>Oneida Indian Nation of New York v. City of Sherrill</u>, 337 F.3d 139, 168 (2d Cir. 2003) (internal citations omitted), rev'd on other grounds sub nom.   <u>City of Sherrill v. Oneida Indian Nation of New York</u>, 544 U.S. 197 (2005).   Here, as Plaintiffs specifically state that none of their allegations are based on knowing misconduct, and the challenged statements amount to opinions which cannot form the basis of claims under the Securities Act unless Defendants subjectively disbelieved those opinions, amendment would be futile.

Accordingly, Defendants' Motion for Reconsideration is GRANTED.  On reconsideration, Plaintiffs' remaining claims are DISMISSED, with prejudice and without leave to replead.

The Clerk of Court is directed to CLOSE the docket in this case.

SO ORDERED.

Dated:    New York, New York

          August 9, 2012

          _Deborah A. Batts_
          DEBORAH A. BATTS
          United States District Judge

6

SPA36

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:_____              │
│ DATE FILED:  8/17/12                 │
└─────────────────────────────────────┘
```

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
In re DEUTSCHE BANK AG
SECURITIES LITIGATION
-------------------------------------------------------------X
This Document Relates To:

ALL ACTIONS
-------------------------------------------------------------X

09 **CIVIL** 1714 (DAB)
**JUDGMENT**

Whereas on August 19, 2011, this Court having granted in part and denied in part Defendants

Motions to Dismiss Plaintiffs' Consolidated Amended Complaint ("CAC"); Defendants having

moved to reconsider this Court's August 19, 2011 decision, and the matter having come before the

Honorable Deborah A. Batts, United States District Judge, and the Court, on August 9, 2012, having

rendered its Memorandum and Order granting Defendants' Motion for Reconsideration, and on

reconsideration, dismissing Plaintiffs' remaining claims, with prejudice and without leave to

replead, it is,

**ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the

Court's Memorandum and Order dated August 9, 2012, Defendants' Motion for Reconsideration is

granted; on reconsideration, Plaintiffs' remaining claims are dismissed, with prejudice and without

leave to replead; accordingly, the case is closed.

**Dated:** New York, New York
        August 17, 2012

**RUBY J. KRAJICK**
_____
**Clerk of Court**

BY: _____
**Deputy Clerk**

THIS DOCUMENT WAS ENTERED
ON THE DOCKET ON _____

**SPA37**

**United States District Court**
**Southern District of New York**
Office of the Clerk
U.S. Courthouse
500 Pearl Street, New York, N.Y. 10007-1213

Date:

In Re:

-v-

Case #:          (          )

Dear Litigant,

Enclosed is a copy of the judgment entered in your case.

Your attention is directed to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, which requires that if you wish to appeal the judgment in your case, you must file a notice of appeal within 30 days of the date of entry of the judgment (60 days if the United States or an officer or agency of the United States is a party).

If you wish to appeal the judgment but for any reason you are unable to file your notice of appeal within the required time, you may make a motion for an extension of time in accordance with the provision of Fed. R. App. P. 4(a)(5). That rule requires you to show "excusable neglect" or "good cause" for your failure to file your notice of appeal within the time allowed. Any such motion must first be served upon the other parties and then filed with the Pro Se Office no later than 60 days from the date of entry of the judgment (90 days if the United States or an officer or agency of the United States is a party).

The enclosed Forms 1, 2 and 3 cover some common situations, and you may choose to use one of them if appropriate to your circumstances.

The Filing fee for a notice of appeal is $5.00 and the appellate docketing fee is $450.00 payable to the "Clerk of the Court, USDC, SDNY" by certified check, money order or cash. __No personal checks are accepted.__

Ruby J. Krajick, Clerk of Court

by: _____

_____, Deputy Clerk

APPEAL FORMS

U.S.D.C. S.D.N.Y. CM/ECF Support Unit                    1                    Revised: May 4, 2010

**SPA38**

**United States District Court**
**Southern District of New York**
Office of the Clerk
U.S. Courthouse
500 Pearl Street, New York, N.Y. 10007-1213

------------------------------------------------X
                                                |
                                                |    **NOTICE OF APPEAL**
                                                |
        -V-                                      |
                                                |
                                                |    civ.          (    )
                                                |
------------------------------------------------X

Notice is hereby given that _____
                                                            (party)
hereby appeals to the United States Court of Appeals for the Second Circuit from the Judgment [describe it]

entered in this action on the _____ day of _____ , _____ .
                                  (day)              (month)              (year)

                                        _____
                                                    (Signature)

                                        _____
                                                    (Address)

                                        _____
                                              (City, State and Zip Code)

Date: _____        (         ) _____-_____
                                              (Telephone Number)

**Note:** You may use this form to take an appeal provided that it is <u>received</u> by the office of the Clerk of the District Court within 30 days of the date on which the judgment was entered (60 days if the United States or an officer or agency of the United States is a party).

**SPA39**

FORM 1

## United States District Court
## Southern District of New York
#### Office of the Clerk
#### U.S. Courthouse
#### 500 Pearl Street, New York, N.Y. 10007-1213

——————————————————X
                          |

                      |      **MOTION FOR EXTENSION OF TIME**
                      |       **TO FILE A NOTICE OF APPEAL**

         -V-          |

                      |        civ.        (   )

——————————————————X

       Pursuant to Fed. R. App. P. 4(a)(5), _____ respectfully

                                        (party)

requests leave to file the within notice of appeal out of time. _____

                                                          (party)

desires to appeal the judgment in this action entered on _____ but failed to file a

                                                    (day)

notice of appeal within the required number of days because:

[Explain here the "excusable neglect" or "good cause" which led to your failure to file a notice of appeal within the required number of days.]

 

                                           _____
                                               (Signature)

                                           _____
                                               (Address)

                                           _____
                                       (City, State and Zip Code)

Date: _____      (   )_____-_____
                                                  (Telephone Number)

**Note:** You may use this form, together with a copy of Form 1, if you are seeking to appeal a judgment and did not file a copy of Form 1 within the required time. If you follow this procedure, these forms must be received in the office of the Clerk of the District Court no later than 60 days of the date which the judgment was entered (90 days if the United States or an officer or agency of the United States is a party).

District Court will <u>receive</u> it within the 30 days of the date on which the judgment was entered (60 days if the United States or an officer or agency of the United States is a party).

FORM 3

**United States District Court**
**Southern District of New York**
**Office of the Clerk**
**U.S. Courthouse**
**500 Pearl Street, New York, N.Y. 10007-1213**

------- ---------------------------------------X
                                                |
                                                |       **AFFIRMATION OF SERVICE**
                                                |
               -V-                              |
                                                |
                                                |       civ.          (    )
                                                |
---------------------------------------------X

I, _____, declare under penalty of perjury that I have

served a copy of the attached _____

_____

upon _____

_____

whose address is: _____

_____

Date: _____
          New York, New York

                                        _____
                                                      (Signature)

                                        _____
                                                       (Address)

                                        _____
                                              (City, State and Zip Code)

FORM 4

APPEAL FORMS

**SPA41**

<u>FORM 2</u>

**United States District Court**
**Southern District of New York**
Office of the Clerk
U.S. Courthouse
500 Pearl Street, New York, N.Y. 10007-1213

```
------------------------------------X
                                    |
                                    |          NOTICE OF APPEAL
                                    |               AND
        -V-                         |       MOTION FOR EXTENSION OF TIME
                                    |
                                    |
                                    |        civ.          (    )
                                    |
------------------------------------X
```

1.       Notice is hereby given that _____ hereby appeals to
                                                   (party)

the United States Court of Appeals for the Second Circuit from the judgment entered on _____.
                    [Give a description of the judgment]


2.       In the event that this form was not received in the Clerk's office within the required time

_____ respectfully requests the court to grant an extension of time in
              (party)

accordance with Fed. R. App. P. 4(a)(5).

         a.       In support of this request, _____ states that
                                                              (party)

this Court's judgment was received on _____ and that this form was mailed to the
                                                  (date)

court on _____ .
                    (date)

                                              _____
                                                          (Signature)

                                              _____
                                                          (Address)

                                              _____
                                                     (City, State and Zip Code)

Date: _____          (    )  _____-_____
                                                     (Telephone Number)

<u>Note:</u> You may use this form if you are mailing your notice of appeal and are not sure the Clerk of the

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------X
In re DEUTSCHE BANK AG              |
SECURITIES LITIGATION              |
                                   |
                                   |
Document Relates to: ALL ACTIONS   |
                                   |
--------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/15/13

MEMORANDUM AND ORDER
09 Civ. 1714 (DAB)

DEBORAH A. BATTS, United States District Judge.

On February 24, 2009, Plaintiffs filed a complaint alleging

that Defendants violated Sections 11, 12(a)(2), and 15 of the

Securities Act. (ECF No. 1.)  On August 19, 2011, this Court

granted in part and denied in part Defendants' Motion to Dismiss

Plaintiffs' Consolidated Amended Complaint. See In re Deutsche

Bank Sec. Litig., No. 09 Civ. 1714 (DAB), 2011 U.S. Dist. LEXIS

93867, at *5 (S.D.N.Y. Aug. 19, 2011).  On August 9, 2012, upon

Defendants' Motion to Reconsider the Court's August 19, 2011

Opinion, this Court granted Defendants' Motion to Dismiss and

dismissed the Complaint with prejudice and without leave to

replead. See In re Deutsche Bank AG Secs. Litig., 09 Civ. 1714

(DAB), 2012 U.S. Dist. LEXIS 115088, at *11 (S.D.N.Y. Aug. 9,

2012).  Plaintiffs now move the Court to reconsider its August 9,

2012 Opinion pursuant to Local Rule 6.3 and Federal Rules of

Civil Procedure 59(e).  For the reasons contained herein,

Plaintiffs' Motion is DENIED.

SPA43

## I. BACKGROUND

The Court presumes the Parties' familiarity with the facts of the case, as the docket sets them out clearly in the previously issued Court Orders dated August 11, 2009, August 19, 2011, and August 10, 2012.

## II. DISCUSSION

### A. Legal Standard for a Rule 59(e) Motion to Reconsider[1]

The standard for granting a Motion to Reconsider "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked--matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." Shrader v. CSC Transp., 70 F.3d 255, 257 (2d Cir. 1995); see Range Road Music, Inc. v. Music Sales Corp., 90 F. Supp. 2d 390, 392 (S.D.N.Y. 2000)(holding that a Motion to Reconsider "is appropriate only where the movant demonstrates that the Court has overlooked controlling decisions or factual matters that were put before it on the underlying motion . . . and which, had they been considered, might have reasonably altered the result before the court.").

---

[1] Plaintiffs also move the Court pursuant to Federal Rule 60(b) but, under the present facts, the 60(b) Motion would require them to meet a higher burden. As such, the Court would only consider the 60(b) Motion if the 59(e) Motion were untimely. See Harrington v. City of Chicago, 433 F.3d 542, 546 (7th Cir. 2006)("While the two rules have similarities, Rule 60(b) relief is an extraordinary remedy and is granted only in exceptional circumstances.").

2

**SPA44**

"The major grounds for justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." <u>Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.</u>, 956 F.2d 1245 (2d Cir. 1992); <u>King County v. IKB Deutsche Industriebank AG</u>, 863 F. Supp. 2d 317, 320 (S.D.N.Y. 2012).  A Motion to Reconsider, therefore, is not a motion in which a movant may reargue "those issues already considered when a party does not like the way the original motion was resolved." <u>Lichtenberg v. Besicorp Group Inc.</u>, 28 Fed. Appx. 73, 75 (2d Cir. 2002)(citing <u>In re Houbigant, Inc.</u>, 914 F. Supp. 997, 1001 (S.D.N.Y. 1996)).  Thus, Local Rule 6.3 should be "narrowly construed and strictly applied" to avoid repetitive arguments already submitted to the Court. <u>In re GE Sec. Litig.</u>, 856 F. Supp. 2d 645, 652 (S.D.N.Y. 2012).  A Motion to Reconsider is neither an "'opportunity for making new arguments that could have been previously advanced,' nor is it a substitute for [an] appeal." <u>Fishoff v. COTY, Inc.</u>, 09 Civ. 628 (SAS), 2009 U.S. Dist. LEXIS 68706 (S.D.N.Y. Aug. 6, 2009)(citing <u>Associated Press v. United States Dep't of Defense</u>, 395 F. Supp. 2d 17, 19 (S.D.N.Y. 2005)).

B. Timeliness

Defendants argue that Plaintiffs' Motion for Reconsideration pursuant to Federal Rule 59(e) is untimely because it was filed

3

34 days after the issuance of the Court's Memorandum and Order. Under Federal Rule 59(e) and Local Rule 6.3, where an Order results in a judgment, the Motion to Alter or Amend must be made within twenty-eight days of the Judgment's entry. Fed R. Civ. P. 59(e); <u>Meteor AG v. Fed. Express Corp.</u>, 08 Civ. 3773 (JGK), 2009 U.S. Dist. LEXIS 107674, at *5-6 (S.D.N.Y. Nov. 18, 2009)(finding that although Party's Rule 59 Motion was filed 95 days after the Court's Order, the Motion was timely because it was filed several days before the Judgment was entered). The Final Judgment[2] in this matter was entered on August 17, 2012, and twenty-seven days later, on September 13, 2012, Plaintiffs filed their Rule 59(e) Motion. (ECF No. 71,72.) The Motion was clearly within the twenty-eight day limit and, therefore, the Motion is timely.

C. Intervening Change in Controlling Law

Plaintiffs argue that <u>Fait v. Regions Fin. Corp.</u>, 655 F.3d 105 (2d Cir. 2011), constitutes an intervening change in controlling law such that their Motion to Reconsider should be granted. (Def.'s Mot. 6.) <u>Fait</u>, however, does not constitute an intervening change in controlling law; it was decided almost a year before the Court issued its Opinion, and was relied upon in the Court's analysis. <u>In re Deutsche Bank AG Secs. Litig.</u>, 09 Civ. 1714 (DAB), 2012 U.S. Dist. LEXIS 115088, at *7-11; <u>see</u> <u>Lazzarino v. Kenton Assocs., Ltd.</u>, 96 Civ. 7842 (RO), 1999 U.S.

---

[2] Also called the "Clerk's Judgment."

SPA46

Dist. LEXIS 8581 at *6 (S.D.N.Y. June 8, 1999)(finding no intervening change in law because the ruling was made well before the Order Plaintiffs sought to be reconsidered); <u>Strini v. Edwards Lifesciences Corp.</u>, No. 05-CV-440 (GLS/DRH), 2008 U.S. Dist. LEXIS 24617 at *9 (N.D.N.Y. Mar. 26, 2008)(holding that the Opinions cited as intervening changes "were both known at the time of the order and do not constitute an intervening change in prevailing law."); <u>Long v. U.S. Department of Justice</u>, 778 F. Supp. 2d 222, 229 (N.D.N.Y. 2011)(finding that a case, which was decided before the issuance of the Court Order and cited in Petitioner's previous submissions, does not constitute an intervening change in controlling law.)

   D. New and Prior-Unavailable Evidence

   Plaintiffs also argue that they have presented newly discovered evidence and, as such, their Motion to Reconsider should be granted. (Def.'s Mot. 7-12.)  All of the proposed evidence was available prior to the filing of the Clerk's Judgment on August 17, 2012, however, an important fact that precludes the Court from concluding that it was "new" or "newly discovered."[3] <u>See</u> <u>Enmon v. Prospect Capital Corp.</u>, 675 F.3d 138, 146 (2d Cir. 2011)("[The] record demonstrates that [the moving

_____

[3] Plaintiffs cited U.S. Senate Subcommittee on Investigations Report, "Wall Street and the Financial Crisis: Anatomy of a Financial Collapse," in their 2011 Memorandum in Opposition to Defendants' Motion for Reconsideration. Furthermore, the Financial Crisis Inquiry Commission Report was publicly available January 2012 and Deutsche Bank's Settlement with the Department of Justice took place in May 2012, neither of which qualifies as newly discovered as they were accessible months before the entry of Judgment.

SPA47

party] had known about the evidence for over a year," and as a result the evidence was neither new nor newly discovered); Campbell v. Cantor Fitzgerald & Co., 98-9582, 1999 U.S. App. LEXIS 38259 (2d Cir. Dec. 23, 1999)("Even if [the moving party] had submitted the transcript to the court along with her Rule 59 motion, the district court would have properly disregarded the evidence because it was previously available to Campbell, and therefore was not newly discovered evidence that might have justified reconsideration of the court's decision.")(internal quote omitted); Jones v. Carolina Freight Carriers Corp., No. 97-7924, 1998 U.S. App. LEXIS 25328 (2d Cir. Apr. 22, 1998)("A motion for reconsideration is not properly used as a vehicle for the introduction of new evidence that could have been presented to the court prior to the decision of which reconsideration is sought.").


III. CONCLUSION

Plaintiffs have not demonstrated an intervening change in controlling law, the availability of new or newly discovered evidence, or the need to correct a clear error or prevent manifest injustice. As such, Plaintiffs have failed to meet the standard for a Motion to Reconsider under Federal Rule 59(e) (or the higher burden under Federal Rule 60(b)). For the reasons stated above, the August 9, 2012 Order dismissing the Complaint

6

**SPA48**

stands and Plaintiffs' Motion to Reconsider is DENIED with prejudice and without leave to amend.

SO ORDERED.

Dated:     May 14, 2013
           New York, New York


_Deborah A. Batts_
Deborah A. Batts
United States District Judge

7

## DECLARATION OF SERVICE

I HEREBY CERTIFY under penalty of perjury that, on December 10, 2013, I am causing a true and correct copy of the foregoing to be filed with the Clerk of the Court for the Second Circuit Court of Appeals by using the appellate CM/ECF. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Executed on December 10, 2013, at San Diego, California.

s/ STEVEN F. HUBACHEK
STEVEN F. HUBACHEK

899330_1